**GILBERT EQUIPMENT COMPANY, INC., Plaintiff,**

v.

**Stephen E. HIGGINS, Director, Bureau of Alcohol, Tobacco, and Firearms, U.S. Department of the Treasury, Defendant.**

Civ. A. No. 88–0242–P.

United States District Court, S.D. Alabama, S.D.

March 7, 1989.

 

Stephen Halbrook, Fairfax, Va., Alex F. Lankford, III, Hand, Arendall, Bedsole, Greaves & Johnston, Blane Crutchfield, Mobile, Ala., for plaintiff.

Andrea Newmark, Dept. of Justice, Sandra Schraibman, Washington, D.C., Eugene Seidel, Asst. U.S. Atty., Mobile, Ala., for defendant.

## ORDER ADOPTING THE RECOMMENDATION OF THE MAGISTRATE

PITTMAN, Senior District Judge.

After due and proper consideration of all portions of this file deemed relevant to the issues raised, and a *de novo* determination of those portions of the recommendation to which objection is made, the recommendation of the magistrate made under 28 U.S. C. § 636(b)(1)(B) is ADOPTED as the opinion of this court.

An analysis considering the plaintiff's objections and the reasons for this court adopting the magistrate's recommendation are set forth herein.

ANALYSIS:

■ 1. Gilbert argues that the magistrate improperly bootstraps standards under "arbitrary-capricious" review onto the mandamus count. Gilbert bases this argument on the magistrate's statement that "inasmuch as this court has already decided that the agency's decision that the USAS–12 is not particularly suitable or readily adaptable to sporting purposes is not arbitrary and capricious, the magistrate certainly cannot find that there was a clear duty on the part of the defendant to grant Gilbert a permit to import the firearm." According to plaintiff, a mandamus claim is irrelevant to whether an APA claim survives a deferential "rational-relation" test, and the magistrate erred in equating the two. Gilbert's contention is without merit. Mandamus is an extraordinary writ which may not properly issue unless three elements co-exist: (1) a clear right to the relief sought; (2) a clear duty on the part of the defendant to do the act in question, and (3) no other adequate remedy available. *District Lodge No. 166, International Association of Machinist and Aerospace Workers v. TWA Services, Inc.,* 731 F.2d 711, 717 (11th Cir.1984).

■ 18 U.S.C. § 925(d)(3) does not grant Gilbert a clear right to import arms into this country. In fact, § 925(d)(3) allows for the importation of firearms only after it has first been determined that the weapon is particularly suitable or readily adaptable to a sporting purpose. In the case *sub judice,* the bureau concluded that due to the weight, size, bulk, designed magazine capacity, configuration, and other factors, the USAS–12 is not particularly suitable for or readily adaptable to a sporting purpose. This decision was reviewed by the magistrate under the arbitrary and capricious standard, and was affirmed. Although the magistrate did not specifically so state, the decision and affirmation in fact establishes that the plaintiff had no clear right to import firearms, and that

bureau had no duty to issue the permit. With these two elements lacking, a writ of mandamus is not proper.

■ 2. Plaintiff argues that the magistrate applied the "rational basis" test to the contrary to law portion of Count Two when the "rational basis" test is only appropriate for a claim of arbitrariness and capriciousness. While the magistrate's recommendation is devoid of any discussion of the contrary to law standard, a review of 18 U.S.C. § 925(d)(3) and its legislative history, reveals that the bureau's action is in accordance with it. § 925, as initially enacted, was designed to keep firearms out of the hands of those not legally entitled to possess them (Magistrate's Recommendation (hereafter MR) p. 5). An amendment in 1986 sought to liberalize importation by providing that the Secretary [of the Treasury] shall, as opposed to may, authorize the importation of firearms generally recognized as particularly suitable for or readily adaptable to sporting purposes (MR p. 10). In addition, the importer's burden of establishing this fact to the Secretary was eliminated. As the magistrate notes however, the Secretary retains the obligation to determine whether specific firearms satisfy this test (MR p. 10). The bureau denied Gilbert's permit request due to the firearm's weight, size, bulk, designed magazine capacity, configuration, and other facts. In light of the fact that § 925(d)(3) provides the Secretary with little guidance in making this determination, there are no facts to indicate that these were not proper factors for the bureau to consider in reaching its decision. Accordingly, it cannot be said that the bureau's decision was contrary to law.

■ 3. Gilbert argues that by disregarding the statutory "generally recognized" component, the agency applied the wrong legal standard in making its decision, and this cannot be corrected by the court. Gilbert bases its argument on that portion of the bureau's decision that reads "the USAS–12 semiautomatic shotgun is not particularly suitable for or readily adaptable for sporting purposes." (Admin. Rec. p. 22). Gilbert also notes that the

court may not supply a reasoned basis for any agency's action which the agency has not given. While this is true, the Supreme Court in *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), held that if the agency fails to explain its actions so that effective judicial review is frustrated, the reviewing court must either (1) obtain from the agency, through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary, or (2) remand to the agency for further amplification. Here, the agency provided the magistrate with additional explanation of the reasons for its decision through the declarations of Edward Owen, Jr. and William Drake (MR p. 15, n. 13). The declaration of Mr. Owen included an in-depth discussion of the agency's position on the "generally recognized" component. According to Mr. Drake, the bureau takes the position that the "generally recognized" component requires both that the firearm itself or the "type" of firearm to which the subject firearm is being compared, has attained general recognition as being particularly suitable for or readily adaptable to sporting purpose, and that a particular use of a firearm has attained general recognition as having a "sporting purpose," or that an event has attained general recognition as being a "sport" before those uses and/or events can be "sporting purposes" or "sports" under § 925(d)(3) (Drake declar. p. 3). Thus, contrary to Gilbert's assertion, the "generally recognized" component was indeed utilized by the bureau in reaching its decision. The magistrate's recommendation also includes a discussion on the bureau's position regading the "generally recognized" component.

■■■■ 4. Gilbert argues that the magistrate gave deference to the agency's opinion of contested questions of law, whereas the deference rule only applies to contested questions of fact within the special expertise of the agency. Gilbert asserts that the issues of whether the USAS–12 is sporting and whether formal target competitions are sports, are legal questions, thus the agency's opinion of these issues was not entitled to deference. Whether these questions are deemed legal, factual or mixed questions of law, the determination of what is a sporting gun and what constitutes a sport clearly involves construction of § 925(d)(3). Generally, the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. *Florida Gas Transmission Co. v. FERC*, 741 F.2d 1307, 1309 (11th Cir.1984). If the rule was otherwise, target shooting could be deemed a sport by some courts, yet not recognized as such by others. As there is nothing in the record to indicate that the bureau's construction is wrong, it is entitled to deference from this court.

■■■ 5. Gilbert contends that as a matter of law, no rational basis exists in the administrative record for the agency's decision. The bureau's two denial letters were indeed short and curt as noted by the magistrate; however, the bureau provided the court with further elucidation of its reasons for denying Gilbert's application for a permit. The magistrate correctly determined that those reasons provide a rational basis for the agency's decision. The bureau determined that the USAS–12 weighed 12.4 pounds unloaded, and this weight makes the gun extremely awkward to carry for extended periods, as used in hunting, and cumbersome to lift repeatedly to fire at multiple small moving targets, as used in skeet and trap shooting (Owen declar. p. 13). The bureau also determined that the USAS–12 contains detachable magazines which permit more rapid reloading. A large magazine capacity and rapid reloading are military features, according to the bureau. The bureau also opined that the overall appearance of the weapon was radically different from traditional sporting shotguns, and strikingly similar to shotguns designed specifically for or modified for combat/law enforcement/anti-personnel use (Owen declar. p. 14). Further, the bureau determined that the activities that the USAS–12 was designed for, various police combat competitions, have not attained "general recognition" as shotgun sports. These reasons provide a rational basis for the bureau's decision. The magis-

trate correctly noted that it is of no moment that the administrative record might also support the opposite conclusion, as the court needs only determine that a rational basis exists for the agency's decision.

6. Gilbert argues that the magistrate's decision is based on the bureau's post hoc litigation rationalizations, and has no basis in the administrative record.

■ 7. Gilbert also contends that the post hoc litigation affidavits relied on by the magistrate should not have been considered according to the rules set forth in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed. 2d 136 (1971) and *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The Supreme Court in *Overton Park* and *Camp* stated that the focal point of an administrative review is the administrative record already in existence, not some new evidence made initially in the reviewing court. *Overton Park* 401 U.S. at 420, 91 S.Ct. at 825; *Camp* 411 U.S. at 142, 93 S.Ct. at 1244. Where the court is faced with a bare record that does not disclose the factors that were considered or the Secretary's construction of the evidence, it may be necessary for the district court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard. *Overton Park* 401 U.S. at 420, 91 S.Ct. at 825. It is clear from the magistrate's recommendation that he relied heavily on materials which were not a part of the administrative record at the time the bureau rendered its decision. A review of the record shows that it was necessary for the magistrate to view additional materials in order to conduct a meaningful review of the agency's action. The two denial letters simply failed to discuss in detail the reasons advanced as the basis for the bureau's decisions. The declarations of Mr. Owen and Mr. Drake [Chief of the Firearms Technology Branch and Deputy Director, Bureau of Alcohol, Tobacco and Firearms, respectively] do not advance new and different reasons for the bureau's actions but merely provide the court with a more detailed explanation of the bureau's action. The magistrate was thus correct in considering the declarations of Mr. Owen and Mr. Drake.

8. Gilbert argues that no rational basis exists for denying sporting uses on the basis of a pistol grip, box magazine, and marketing, the only reasons cited by the magistrate. Plaintiff is totally incorrect in its allegations that the pistol grip, box magazine and marketing were the only reasons cited by the magistrate for the denial of the sporting use of USAS–12. While these were no doubt pivotal reasons for the denial, the magistrate's recommendation also included a discussion of the gun's weight and drum magazine, and the fact that the bureau was wholly unimpressed with the evidence that Gilbert submitted with its initial application and reconsideration letter. The magistrate found that a rational relationship existed between these facts and the decision made by the bureau. As discussed in objection #5, the magistrate's finding is supported by the record.

■ 9. Gilbert argues that no rational basis exists for holding that organized competitive target competitions, using bulls-eye or animal-like targets and shooting ballshot or slugs, is some kind of "police combat" game and is not a "sport." § 925(d)(3) provides absolutely no guidance in determining which activities constitute a "sport." The determination of a weapon's suitability for sporting "rest[s] directly with the Secretary of the Treasury." 114 Cong.Rec. 27465, col. 2 (Sept. 18, 1968) (statement of Sen. Murphy). The Secretary has delegated his authority to make determinations concerning sporting purposes to the Bureau of Alcohol, Tobacco and Firearms. 27 C.R.F. Part 17B. Great deference is to be accorded the interpretation of § 925(d)(3) by the agency charged with its administration. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964); *American Mutual Liability Ins. Co. v. Smith,* 766 F.2d 1513, 1519 (11th Cir.1985).

■ The bureau determined that bulls-eye or animal-like targets and shooting ball-shot or slugs are of a kind of "police

combat" game and is not a "sport." In 1982, the bureau took the position that "police combat" games did in fact constitute a sport; however, in 1984, the bureau changed its position on this issue. According to the bureau, "police combat" competitions have only recently generated interest outside the military/law enforcement area, and had not by 1984—and still have not—gained general recognition as sports. The bureau states that it simply misapplied the "sporting test" in 1982 [see Owen and Drake declar.]. The court cannot say that this was not a rational basis for the bureau's decision that "police combat games" were not a sport.

 10. Gilbert argues that the magistrate relied on allegations of which there are material questions of fact in controversy, which is prohibited in a summary judgment motion. Specifically, Gilbert contends that the questions of whether a 12-pound shotgun is too heavy for hunting and competition, or whether the game in question has sufficient numbers of participants to be "sports," etc. are material issues of fact which are in dispute. In *Bank of Commerce of Laredo v. City National Bank of Laredo*, 484 F.2d 284, 289 (5th Cir.1973). *cert. denied* 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974), the Fifth Circuit stated that "when a plaintiff who has no right to a trial de novo brings an action to review an administrative record which is before the reviewing court, the case is ripe for summary disposition, for whether the order is supported by sufficient evidence, under the applicable statutory standard, or is otherwise legally assailable, involve matters of law. The appropriate legal standard for conducting such review is that established by the legislation authorizing the agency action and the appurtenant provisions of the Administrative Procedure Act." Thus, contrary to the plaintiff's contention, the court's role here is not to resolve contested fact questions which may exist in the underlying administrative record, but rather the court must determine the legal question of whether the agency's action was arbitrary and capricious.

 11. Gilbert argues that a deference rule is inconsistent with the intent of the Firearms Owners' Protection Act (FOPA) of 1986. There is nothing in the Act or its legislative history to support plaintiff's allegation. In fact, the plain language of the statute places the task of administering the statute on the Secretary of the Treasury [who has delegated this authority to the bureau] not the courts. This makes sense in view of the fact that the bureau is in a far better position to determine whether an activity is a sport, and whether a firearm is a sporting firearm. While the courts generally accord great deference to an interpretation of a statute by the agency charged with administering it, the agency's decisions are not merely rubber stamped; instead they are subjected to a searching and careful review by the courts. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964), *reh'g denied*, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965); *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. In the end though, the court's review is limited to whether a rational basis exists for the agency's action.

 12. Gilbert argues that the magistrate misapplied the deference standard by rejecting the administrative interpretation of 1968–1986, and applying an admittedly "subjective" and vague standard concocted for this litigation. It should first be noted that in one of the cases relied upon by plaintiff, *National Distributing Co., Inc. v. U.S. Treasury Dept.*, 626 F.2d 997, 1014 (D.C.Cir.1980), the court criticized the agency's change in policy not because the agency saw fit to change its interpretation of a statute, but because the agency had denied any shift in its policy, and had refused to issue an explanation for the change. In this case, the bureau unequivocally set forth the reasons for its change in position. The bureau acknowledges that prior to 1986, the agency relied upon caliber, gauge and safety features as being indicative of sporting use. The bureau maintains that even then the firearm still had to be evaluated as a whole to determine whether it was particu-

larly suitable for a sporting purpose. The bureau contends that from 1968 to approximately 1980, the vast majority of new shotguns have been traditional sporting shotguns, and that not until this decade, in response to a recently growing interest in paramilitary equipment, has shotguns developed for law enforcement been sought to be imported as sporting shotguns. Thus, prior to 1980, the bureau contends that it was not necessary for them to establish a list of factors for the importation of these allegedly "sporting" shotguns (Owen declar. p. 21). As noted by the magistrate, these factors (weight, size, bulk, designed magazine capacity, configuration, etc.) are characteristic of all firearms thus are logical characteristics for the bureau to consider in determining whether a particular firearm is particularly suitable for or readily adaptable to sporting purposes.

■ 13. Gilbert argues that even if deference to the agency's administrative practice as the proper interpretation of law is proper, the magistrate ignored the administrative practice followed in 1968–1986 and instead deferred to litigation arguments. The reason for the agency's policy shift has already been discussed. It has also already been determined that the declarations of Mr. Drake and Mr. Owen were properly considered by the magistrate. The bureau did not invent new rationales for its denial of importation of the USAS–12 but simply expounded on the reasons originally given. The declarations of Drake and Owen speak to the weight, size, bulk, configuration of the USAS–12. These were all reasons given for the initial denial of importation of the USAS–12. It was not the magistrate's role, and it is not this court's role, to determine that the bureau's prior practice was the better position. The court need only be satisfied that the bureau's policy change, and denial, were not the result of arbitrary and capricious action.

14. Gilbert argues that statutory interpretation is for the judiciary, and the magistrate erred in deferring to the agency on questions of law. While it is true that the magistrate deferred to the agency's interpretation of § 925(d)(3), the plaintiff fails to cite any instance in which the magistrate deferred to the agency on purely questions of law. There is no doubt that the courts are the final authorities on issues of statutory construction, yet it is a long established principle that the court will adhere to the construction of a statute by those charged with its execution, unless there are compelling indications that it is wrong. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964). There are no indications that the bureau's construction is erroneous.

15. Gilbert contends that the magistrate ignores accuracy, safety, and other sporting factors cited in the statute by ATF in the years 1968–1986, and by sportsmen, and instead relies on meaningless factors invented for this litigation. The magistrate found that the factors relied upon by the bureau, namely, weight, size, bulk, designed magazine capacity and configuration, for the denial of importation of the USAS–12 had not previously been cited as factors determinative of the sporting test. The magistrate concluded, however, that because these factors are characteristic of all firearms, they are logical characteristics for the bureau to consider. The bureau has indicated that this switch in factors has been necessitated by the growing number of non-conventional shotguns sought to be imported as "sporting" firearms. The court cannot say that this was not a rational basis for the bureau's decision.

■ 16. Gilbert argues that the magistrate defers to the opinion of one bureaucrat, Mr. Owen, without any examination of his credentials or those of Gilbert's experts. From a review of the record, it is clear that the magistrate relied heavily on Mr. Owen's declaration in an effort to discern further elucidation for the agency's action. The plaintiff points the court to no facts which would tend to show that Mr. Owen is unqualified to serve the bureau, and his opinion is entitled to no weight. Mr. Owen's declaration shows that he has extensive experience in the area of firearms. The magistrate was thus correct in relying on the declaration of Mr. Owen to

discern further elucidation for the agency's action.

17. Gilbert argues that numerous post hoc litigation rationalizations, which the magistrate relies on as if they are parts of the administrative record, are clearly refuted by the administrative record. Gilbert contends that the videotape, submitted with its application, shows that the USAS–12 has less muzzle rise than standard sporting shotguns, although the bureau (and later the magistrate) state that the tape did not compare USAS–12 with conventional sporting shotguns. The bureau did not deny that the USAS–12 has less muzzle, but criticizes the tape because it failed to compare the firearm's weight, bulk, size, designed magazine capacity, and configuration with conventional firearms.

The plaintiff also argues that the bureau incorrectly stated that the survey of state game commissions was directed to the legality of the use of the USAS–12 for hunting rather than to its suitability for sporting purposes. The question posed to state game commissions was "would the USAS–12 be particularly suitable for or readily adaptable to hunting under the game regulations of your state?" Some of the comments received in response to this question clearly indicate that at least some of those answering the question thought it was directed to the legality as opposed to the sporting purposes of the firearm. One respondent in particular stated that the USAS–12 would be legal for small and large game—but not particularly suitable (A.R. 113, 123, 133).

Plaintiff argues further that the bureau's statement that Gilbert's experts, Crossman and Sears, did not address the salient physical features of the firearm which served the basis for the agency's decision, is incorrect. According to Gilbert, these experts explained the clear sporting advantages of the box magazine and the reduced kick and muzzle rise due to the weight, pistol grip, and straight line stock. The bureau states that the physical features that Gilbert's experts addressed were not features that render a shotgun particularly suitable for sporting purposes. The

bureau opined that the low recoil effect and muzzle rise, which Gilbert's experts emphasized, was of little value to the "sporting" determination, since it is offset by the weight and bulk of the USAS–12, which is more important to sportsmen. The bureau also noted that Gilbert's expert, Mr. Crossman, never stated that the USAS–12 is "of a type" of shotgun "generally recognized" as sporting, or that the "sports" for which it may be suited are "generally recognized" sports. The bureau's findings are not clearly refuted by the administrative record.

18. Gilbert argues that the magistrate erred in deciding that the agency's decision was "warranted by the facts" as "borne out by the administrative record." Although the magistrate states that the agency's decision was warranted by the facts as borne out by the administrative record, it is clear that the declarations of Mr. Owen and Mr. Drake were also relied upon by the magistrate to substantiate the agency's decision. Contrary to the plaintiff's contention, those declarations were not mere post hoc litigation rationalizations, but constituted more detailed explanations of those reasons originally advanced by the agency for its denial. It has already been determined that based on the administrative record, and the declarations of Mr. Owen and Mr. Drake, the agency's decision was rational, and borne out by the complete record.

19. Gilbert contends that the magistrate's decision would delete the "readily adaptable" standard from § 925(d)(3). Gilbert argues that the magistrate dwelled on the particularly suitable component of § 925(d)(3), and essentially ignored the alternative "readily adaptable" standard. Although the magistrate's recommendation lacks an in-depth discussion of the "readily adaptable" standard, a review of the record shows that the bureau did in fact consider the "readily adaptable" standard in reaching its decision to deny importation. The bureau has consistently stated that the USAS–12 is a semi-automatic version of a military type assault shotgun. Mr. Owen stated that the Benelli Super 90 and the Benelli VM, which Gilbert

compares to the USAS–12, are traditional sporting shotguns adapted for military/law enforcement use by adding over-sized magazines, non-glare finished and synthetic stocks and forearms. According to Mr. Owen, the USAS–12 was designed as a military assault weapon and has never had the basic features of a traditional sporting shotgun (Owen declar. p. 19). The bureau cites the separate combat style pistol grip located on the bottom of the receiver forward of the buttstock, the barrel to buttstock configuration, and the general shape and overall appearance of the firearm that makes it radically different from traditional sporting shotguns and not readily adaptable to sporting purposes (Owen declar. p. 15). Contrary to Gilbert's contention, the "readily adaptable" standard was indeed utilized by the bureau in reaching its decision.

■ 20. Gilbert argues that in recommending dismissal of the due process claim, the magistrate ignored the fact that competitors are allowed to import shotguns with features similar to the USAS–12, but Gilbert is held to a different standard. Gilbert is in essence arguing that the bureau has applied a facially neutral statute in an unequal manner. As was noted by the magistrate, in order to prevail on this claim, Gilbert must prove that the bureau intentionally discriminated against them. *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 (11th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). There are no facts in this case to support a claim of purposeful discrimination. The bureau acknowledges that SPAS–12 and Benelli Super 90 shotguns are allowed to be imported, although they have features similar to the USAS–12 and are marketed to both sportsmen and law enforcement. The bureau notes that while these guns have some military features, they retain the basic features of traditional sporting shotguns. The bureau also states that the USAS–12 is not the only shotgun denied an importation permit. The Striker–12 was denied classification as a sporting shotgun, and the SPAS–12, which the bureau allowed to be imported on the basis of its suitability for use in police combat competi-

tions back in 1982, will be subjected to the "revised" sporting test.

■ Gilbert argues that liberty and property interests exist in the freedom of a licensed importer to import and sell commodities, and be subject to the same standards as competitors. As noted above, there is no indication that Gilbert is being subjected to standards which are different from those other importers are subjected to. Further, in order to have a protectable property interest, Gilbert must demonstrate that it has a legitimate claim of entitlement to it. The magistrate was correct in concluding that any right to import firearms is activated only after the firearm sought to be imported is shown to be particularly suitable or readily adaptable to sporting purposes. It has been determined that the USAS–12 does not meet this criteria.

■ 21. Gilbert's final argument is that the magistrate ignores the fact that before arms may be "kept" under the second amendment, arms must be produced and acquired. The magistrate found that the second amendment guarantees the right to keep and bear arms, but does not give Gilbert a right to import arms. Gilbert argues that the magistrate is incorrect, yet fails to cite any authority in support of its position. The magistrate relied on *United States v. Swinton*, 521 F.2d 1255 (10th Cir.1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976) in reaching his decision. *Swinton* is a criminal case wherein the defendant was convicted of engaging, without a license, in the business of dealing in firearms. The Court held, in part, that there is no absolute constitutional right of an individual to possess a firearm. In *United States v. King*, 532 F.2d 505 (5th Cir.1976), *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976), the defendant was also convicted of dealing in firearms without a license. In upholding his conviction, the Fifth Circuit noted that the defendant was convicted not of bearing arms, but of selling them without a license. *Id.* at 510. Similarly, in the case *sub judice*, Gilbert is not being denied

its right to bear arms, but is simply being prevented from importing into this country arms that are not particularly suitable or readily adaptable to a sporting purpose.

Accordingly, the magistrate's recommendation is ADOPTED as the opinion of this court.

### JUDGMENT

It is ORDERED, ADJUDGED and DECREED that defendants' motion for summary judgment is GRANTED. Plaintiff's cross-motion for summary judgment is DENIED, costs to be taxed to plaintiff.

### RECOMMENDATION OF MAGISTRATE

WILLIAM E. CASSADY, United States Magistrate.

This case is before the Magistrate for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. Upon consideration of the administrative record and all pertinent materials contained in this file, the Magistrate makes the following recommendation.

### FACTS

In 1986, Gilbert Equipment Company, a licensed importer of firearms, applied to the Bureau of Alcohol, Tobacco and Firearms (hereinafter "ATF") for a permit to import the USAS–12 shotgun. (*See* A.R. 2). The USAS–12 is a highly advanced magazine-fed semiautomatic 12–gauge shotgun manufactured by Daewoo Precision Industries in Korea. (¶ 5 of Complaint). Soon after applying for the permit, Gilbert submitted information to the Bureau in an attempt to demonstrate that the USAS–12 "is generally recognized as particularly suitable for or readily adaptable to sporting purposes" and is thus importable under 18 U.S.C. Section 925(d)(3). (¶ 6 of Complaint; *see* A.R. 2–19). After several meetings between the parties and testing and evaluation by the Bureau, ATF, by letter dated December 16, 1986 from the

office of William T. Drake, ATF Deputy Director, denied permission to Gilbert to import the USAS–12 inasmuch as "due to the weight, size, bulk, designed magazine capacity, configuration and other factors, the USAS–12 semiautomatic shotgun is not particularly suitable for or readily adaptable to sporting purposes." (A.R. 22). On February 19, 1988, Gilbert sought ATF's permission to import five hundred (500) USAS–12 shotguns and accompanied its application with extensive memoranda, exhibits, and a videotape in support of a sporting use determination (¶ 14 of Complaint). By letter dated March 1, 1988, William E. Earle, Chief of the Firearms and Explosives Division, denied the application stating that ATF"s position remained unchanged (A.R. 197–98). On March 24, 1988, plaintiff filed in this Court a complaint seeking: (1) mandamus relief; (2) a determination by this Court that defendant's actions were arbitrary, capricious, and an abuse of discretion; (3) a determination by the Court that defendant's conclusions were unwarranted by the facts and were not based on any facts; (4) a determination by this Court that the defendant violated its rights to due process of law and equal protection of the laws, rights which are guaranteed by the Fifth Amendment; and (5) a determination by this Court that defendant violated plaintiff's Second Amendment right to keep and bear arms.[1] The parties' summary judgment memoranda have addressed all of the forms of relief requested and thus, a determination by this Court on the cross motions will make unnecessary a trial of this cause.

### STATUTORY HISTORY

In 1968, Congress enacted the Gun Control Act which was designed to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the states and their subdivisions in combating the ever increasing prevalence of crime in

---

**1.** Plaintiff opines that the right to keep and bear arms includes the right to manufacture, import, sell and purchase arms.

the United States. 1968 U.S.Code Cong. & Admin.News 2112, 2113–2114.[2] In 1968, Section 925(d) of the Act provided in pertinent part as follows:

The Secretary *may* authorize a firearm or ammunition to be imported or brought into the United States or any possession thereof if *the person importing or bringing in the firearm or ammunition establishes to the satisfaction of the Secretary that the firearm or ammunition ...*

(3) is of a type that does not fall within the definition of a firearm as defined in Section 5845(a) of the Internal Revenue Code of 1954 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms.

18 U.S.C. § 925(d)(3) (emphasis added).[3]

The clear intent of Section 925(d)(3) was to "curb the flow of surplus military and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting." 1968 U.S.Code Cong. & Admin.News 2112, 2167.[4] As Senator William Dodd, sponsor of the legislation, emphasized,

Title IV prohibits importation of arms which the Secretary determines are not suitable for research, sport, or as museum pieces ...

The entire intent of the importation section is to get at those kinds of weapons that are used by criminals and that have no sporting purpose.

**2.** The Gun Control Act of 1968, as amended, 18 U.S.C. §§ 921–29, along with the National Firearms Act of 1934, as amended, 26 U.S.C. Chapter 53, regulate the importation of firearms.

**3.** The underlined words were deleted in 1986.

**4.** However, Section 925(d) of the Act was not meant to interfere with the bringing in of "currently produced firearms, such as rifles, shotguns, pistols or revolvers of recognized quality which are used for hunting and for recreational purposes, or for personal protection." *Id.* (emphasis added).

**5.** Apparently at that time, the thrust of the legislation was to keep Saturday Night Specials and other cheaply made revolvers out of the United States.

114 Cong.Rec. S 5556 Col. 3, S 5582 Col. 1, S 5585 Col. 2 (May 14, 1968) (statement of Senator Dodd).[5] The determination of a weapon's suitability for sporting purposes was entrusted to the Secretary of the Treasury. 114 Cong.Rec. 27465, Col. 2 (Sept. 18, 1968) (statement of Sen. Murphy). As noted in one of the Senate Reports,

The difficulty of defining weapons characteristics to meet this target [of eliminating importation of weapons used in crime], without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition ...

S.Rep. No. 1501, 90th Cong.2d Sess. 38 (Sept. 6, 1968).[6]

To assist the Secretary in exercising his discretion, Congress "recommended that the Secretary establish a council that would provide guidance and assistance to him in determining those firearms which meet the criteria for importation into the United States...." S.Rep. No. 1501, 90th Cong.2d Sess. 38 (Sept. 6, 1968). Immediately following enactment of the Gun Control Act, the Secretary of the Treasury appointed a Firearms Evaluation Panel to establish guidelines for implementation of the "sporting purposes" test of Section 925(d)(3), said panel being composed of representatives from the military, law enforcement, and firearms industries.[7] While the panel did not propose specific criteria for

**6.** In fact, opponents of the bill contended that

The proposed restrictions of Title IV would give the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes....

S.Rep. No. 1097, 90th Cong.2d Sess. 255 (April 29, 1968), reprinted in 1968 USSCAN at 2306 ("Individual Views of Messrs. Dirksen, Hruska, Thurmond and Burdict on Title IV.").

**7.** At the initial meeting of the Firearms Advisory Panel it was clearly understood that the role of the panel would be advisory only and that it was the responsibility of ATF to make final "sporting purposes" determinations. (A.R. 103).

evaluating shotguns [8] the apparent general criteria relied upon by the advisory panel and ATF from 1968 through 1986 for determining what is "generally recognized" as a sporting firearm is as follows:

The Director may compile an Importation List of firearms and ammunition which he determines to be generally recognized as particularly suitable for or readily adaptable to sporting purposes.... No firearm shall be placed on the Importation List unless it is found that:

(1) the caliber or gauge of the firearm is suitable for use in a recognized shooting sport,

(2) the type of firearm is generally recognized as particularly suitable or readily adaptable to such use, and

(3) the use of the firearm in a recognized shooting sport will not endanger the person using it due to deterioration through such use or because of workmanship, materials or design.

Specifically, with regard to shotguns, the two factors panel members were concerned with were the lack of easy convertability to full automatic and the barrel and overall length of the weapon (18 inch barrel length and 26 inch overall length for shotguns).

In 1986, Section 925(d) of the Gun Control Act was amended by the Firearms Owner's Protection Act to read in pertinent part as follows:

The Secretary *shall* authorize a firearm or ammunition to be imported or brought into the United States or any possession thereof if the firearm or ammunition ...

(3) is of a type that does not fall within the definition of a firearm as defined in Section 5845(a) of the Internal Revenue Code of 1954 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, exclud-

ing surplus military firearms, *except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.*

18 U.S.C. § 925(d)(3) (emphasis added).

The amendments to the Statute provide that the Secretary shall (instead of "may") authorize the importation of firearms generally recognized as particularly suitable for or readily adaptable to sporting purposes. Additionally, the amendments whittled away at the Secretary's discretion by eliminating the requirement that the importer of firearms establish to the satisfaction of the Secretary that the particular firearm sought to be imported is generally recognized as particularly suitable for or readily adaptable to sporting purposes. Regardless of the changes made, the firearm must meet the sporting purposes test and it remains the Secretary's obligation to determine whether specific firearms satisfy this test. The Senate Report on the 1986 amendments S.Rep. No. 583, 98th Cong. 1st Sess, August 8, 1984, stated that "[i]t is anticipated that in the vast majority of cases, [the substitution of "shall" for "may" in the authorization section] will not result in any change in current practice." However, opponents of the amendments viewed the changes as liberalizing and opening up of the importation of firearms into the United States "by mandating the Secretary to authorize importation of a firearm if there is a sporting purpose and eliminating the requirement that the importer has the burden of satisfying the Secretary of the sporting purpose." Firearms Owners' Protection Act, 100 Stat. 1340 (1986) (amending § 925 of the Gun Control Act of 1968, 18 U.S.C. §§ 921–929 (1986)).

---

**8.** The panel did, however, recommend the adoption of factoring criteria to evaluate the various types of handguns based upon such considerations as overall length of the firearm, caliber, safety features, et cetera, and an evaluation sheet (ATF Form 4590) was thereafter devel-

oped and used for the purpose of evaluating handguns pursuant to Section 925(d)(3). The development of a specific evaluation sheet for handguns emphasizes the concern of many in the late 1960's of the proliferation of the cheaply manufactured Saturday Night Specials.

## DISCUSSION

### I. WAS ATF'S DETERMINATION THAT THE USAS–12 SHOTGUN IS NOT A "SPORTING" WEAPON ARBITRARY OR CAPRICIOUS?

A. *The Scope and Standard of Review.* As the Magistrate has noted previously, plaintiff has alleged that ATF's determination that the USAS–12 is not a "sporting" weapon was "arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and otherwise not in accordance with law." (Complaint, ¶ 20). Section 706 of the Administrative Procedure Act provides six separate standards of judicial review of agency actions. Specifically for this Court's purposes, Section 706(2)(A) provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[9] This is the standard of review this Court will employ to determine whether ATF properly concluded that the USAS–12 is not a sporting shotgun; a closer examination of this standard is, therefore, warranted.

Before a court can reach the determination that an agency's actions were arbitrary or capricious, said court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Bowman Transport, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).[10] That is, the particular agency must articulate a "rational connection between the facts found and the choice made." *Bowman, supra,* 419 U.S. at 285, 95 S.Ct. at 442 (*quoting Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)).[11] While the Supreme Court has stated that it will "not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947)," the High Court has also indicated that it will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206] (1945)." *Bowman, supra,* 419 U.S. at 285–86, 95 S.Ct. at 442.[12]

In applying the arbitrary and capricious standard, the focal point of review is the administrative record "already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S.

---

**9.** Section 706 of the Act also provides for *de novo* review. 5 U.S.C. § 706(2)(F). However, *de novo* review is authorized only in the following circumstances: (1) when the action is adjudicatory in nature and the agency factfinding procedures are inadequate; and (2) when issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The facts of the instant case do not fit within one of these two situations and therefore *de novo* review is not warranted.

**10.** This deferential standard of review presumes the validity of the agency action. *Manasota–88, Inc. v. Thomas,* 799 F.2d 687, 691 (11th Cir. 1986).

**11.** Put still another way, for a court to affirm an agency's actions, said court need only determine that the agency had a rational basis for its decision. *Manasota–88, Inc. v. Thomas,* 799 F.2d 687, 691 (11th Cir.1986).

**12.** The Circuit Court for the District of Columbia has stated that "[i]t is only where there is no rational nexus between the facts found and the choice made that a court is authorized to set aside the agency determination." *Certified Color Manufacturers Ass'n v. Mathews,* 543 F.2d 284, 294 (D.C.Cir.1976). Additionally, the Supreme Court has noted that when a purely factual question within the area of competence of an administrative agency created by Congress is considered and when "resolution of that question depends on 'engineering and scientific' consideration," the relevant agency's technical expertise and experience, is recognized and its analysis is deferred to "unless it is without substantial basis in fact." *FPC v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 644, 30 L.Ed.2d 600 (1972).

138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). If the agency fails to explain its actions so that effective judicial review is frustrated, the reviewing court must either (1) obtain from the agency, through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary,[13] or (2) remand to the agency for further amplification. *Pitts, supra,* 411 U.S. at 142–43, 93 S.Ct. at 1244.

B. *"Sporting Purposes" Test.* The statute establishes that a "sporting" firearm is a weapon which is generally recognized as particularly suitable or readily adaptable to sporting purposes. 18 U.S.C. § 925(d)(3). The Bureau claims that in making a sporting determination it attempts to determine whether the firearm is of a type traditionally used in recognized sporting activities or is as suitable for recognized sporting activities as firearms traditionally used for such activities. (Drake Dec. ¶ 7). ATF views the "generally recognized" qualification to require both that the firearm itself or the "type" of firearm to which the subject firearm is being compared have attained general recognition as being particularly suitable for or readily adaptable to sporting purposes,[14] and that a particular use of a firearm have attained general recognition as being a "sporting purpose," or that an event have attained general recognition as being a "sport," before those uses and/or events can be "sporting purposes" or "sports" under Section 925(d)(3).[15]

The interpretation of a statute by the agency charged with administering it is generally entitled to great deference, *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, *reh'g denied,* 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965); *see Blue Cross & Blue Shield v. Department of Banking & Finance,* 791 F.2d 1501, 1506 (11th Cir.1986) ("We need not find that its [the agency's] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."), unless there are compelling indications that said interpretation is wrong. *American Mut. Liab. Ins. Co. v. Smith,* 766 F.2d 1513, 1519 (11th Cir. 1985) ("We will adhere to the 'principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.'"); *see Florida Gas Transmission Co. v. FERC,* 741 F.2d 1307, 1309–10 (11th Cir.1984) ("The agency's view must be upheld unless it is so plainly erroneous or so inconsistent with either the regulation or the statute authorizing the regulation that its decision is arbitrary, capricious, an abuse of direction or otherwise not in accordance with law.").

Furthermore, "[t]he words of statutes ... should be interpreted where possible in their ordinary, everyday senses," *Malat v. Riddell,* 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966); *Lane v. United States,* 727 F.2d 18, 20 (1st Cir.) (in a suit involving the Equal Access to Justice Act, the appellate court stated that "the plain language of the statute itself must be regarded as conclusive."), *cert. denied,* 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 57 (1984). However, "a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute." *Bob Jones University v. United States,* 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157

---

**13.** The Bureau has provided this Court with additional explanation of the reasons for its decision through the declarations of Edward M. Owen, Jr. and William T. Drake.

**14.** Specifically, where classification of a 12–gauge shotgun under Section 925(d)(3) is involved, ATF looks to see whether the firearm is the "type" of 12–gauge shotgun which is generally recognized as suitable for traditional shotgun sporting purposes such as hunting, and trap and skeet shooting, or is as suitable for recognized sporting activities as the type which is generally recognized. (Drake Dec. ¶ 8); (Owen Dec. ¶ 7).

**15.** Thus, ATF argues that while hunting, and trap and skeet shooting have been recognized shotgun "sports" for centuries, and target shooting a recognized handgun and rifle "sport," events such as police combat competitions only recently have generated interest outside the military and law enforcement arena and may or may not attain general recognition as "sports." (Drake Dec. ¶ 8); (Owen Dec. ¶ 33).

(1983); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) ("[I]n rare cases the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters, and those intentions must be controlling."). Thus, ATF argues that the "generally recognized" qualification must be read to limit the types of firearms and sports which would classify a firearm as "sporting" under Section 925(d)(3). Additionally, ATF contends that given the fact that the word "particularly" modifies the word "suitable" a firearm which might be recognized as "suitable" for use in traditional sports would not meet the statutory criteria unless it were recognized as particularly suitable for such use.[16] Finally, ATF argues that the

drafters of the legislation did not intend for "sports" to include every available type of activity or competition which might employ a firearm inasmuch as a "sporting purpose" could be advanced for every firearm sought to be imported.[17]

C. *Application of the "Sporting Purposes" Test By ATF to the USAS–12.* As this Court has heretofore stated, ATF, after testing and examining the USAS–12, concluded that due to the weight, size, bulk, designed magazine capacity, configuration, and other factors, Gilbert's semiautomatic shotgun is not particularly suitable for or readily adaptable to sporting purposes; rather, ATF is of the opinion that the weapon is a semiautomatic version of a selective fire military type assault shotgun (A.R. 22–23). The Bureau argues that the

**16.** Senator Dodd pointed out that the intent of the legislation was to "[regulate] the importation of firearms by excluding surplus military handguns, and rifles, and shotguns that are not truly suitable for sporting purposes." 114 Cong. Rec. S 5586, Co. 2 (May 15, 1968) (Statement of Sen. Dodd).

**17.** During the Congressional discussions leading to enactment of the Gun Control Act, Senator Dodd and Senator Hansen engaged in the following colloquy concerning the meaning of "sporting purposes":

MR. HANSEN: Would the Olympic shooting competition be a "sporting purpose?"

MR. DODD: I would think so.

MR. HANSEN: What about trap and skeet shooting?

MR. DODD: I would think so. I would think that trap and skeet shooting would certainly be a sporting activity.

MR. HANSEN: Would the Camp Perry national matches be considered a "sporting purpose?"

MR. DODD: Yes, that would not [sic] fall in that arena. It should be described as a sporting purpose.

MR. HANSEN: I understand the only difference is in the type of firearms used at Camp Perry which includes a wide variety of military types as well as commercial. Would all of these firearms be classified as weapons constituting a "sporting purpose?"

MR. DODD: No, I would not say so. I think when we get into that, we definitely get into a military type of weapon for use in matches like those at Camp Perry; but I do not think it is generally described as a sporting weapon. It is a military weapon. I assume they have certain types of competition in which they use these military weapons as they would in an otherwise completely sporting event. I do not

think that fact would change the nature of the weapon from a military to a sporting one.

MR. HANSEN: Is it not true that military weapons are used in Olympic Competition also?

MR. DODD: I do not know. Perhaps the Senator can tell me. I am not well informed on that.

MR. HANSEN: It is my understanding that they are. Would the Senator be inclined to modify this response if I say that is true? (27461)

MR. DODD: It is not that I doubt the Senator's word. Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event. I think the Senator would agree with that. I do not know how else we could describe it ...

MR. HANSEN: If I understand the Senator correctly, he said that despite the fact that a military weapon may be used in a sporting event, it did not by that action, become a sporting rifle. It that correct?

MR. DODD: That would seem right to me.... As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons.... I think the Senator and I know what a genuine sporting gun is.

114 Cong.Rec., 90th Cong., 2d Sess. Pt. 21, 27461–62 (September 18, 1968).

The Firearms Advisory Panel also made it clear that not every activity in which ammunition is expended and persons participate would be considered a sport for purposes of importation (*e.g.*, " 'plinking' was described as a pastime by the panel since any firearm that could expel a projectile could be used for this purpose without having any characteristic generally associated with target guns."). (A.R. 103).

aforementioned factors or characteristics provide a rational basis for its determination denying Gilbert permission to import the USAS–12 into the United States. Since the curt administrative denial of Gilbert's application to import the USAS–12 and the mere reaffirmation of that decision in late March, 1988, (A.R. 199), ATF has provided this Court with further elucidation of its reasons for denying Gilbert's application for a permit to import the firearm, as follows:

1. The weight of the weapon, 12.4 pounds, makes it much heavier than traditional 12–gauge sporting shotguns [18] and thus makes it awkward to carry for extended periods, as is required in hunting, and cumbersome to lift repeatedly to fire at multiple small moving targets as used in skeet and trap shooting.

2. The width of the USAS–12 with drum magazine (approximately 6 inches) and the depth with box magazine (in excess of 11 inches) far exceed that of traditional sporting shotguns which do not exceed three inches in width or four inches in depth.[19] The Bureau argues that because of the large size and bulk of the USAS–12, the firearm is extremely difficult to maneuver quickly enough to engage in moving targets as is necessary in most types of hunting, and in skeet and trap shooting.

3. The detachable box (12–cartridge capacity) and the drum magazine (28–cartridge capacity) have larger capacities than those of traditional repeating sporting shotguns which contain tubular magazines with a capacity of three to five cartridges. Additionally, detachable magazines permit more rapid reloading than do tubular magazines. Finally, the few manually operated 12–gauge shotguns which incorporate detachable box magazines are supplied with two (2) cartridge capacity magazines; those 12–gauge semiautomatic and fully automatic shotguns which employ larger capacity detachable magazines are specially designed combat weapons or conventional shotguns modified for law enforcement and military use.[20]

4. The combat style pistol grip (located on the bottom of the receiver forward of the buttstock), the barrel-to-buttstock configuration, the bayonet lug, and the overall appearance and general shape of the gun are radically different from traditional sporting shotguns and strikingly similar to shotguns designed specifically for or modified for combat and law enforcement use. Specifically, the pistol grip facilitates the handling of the weapon when fired from positions other than the shoulder and also facilitates control of the weapon with one hand while traditional shotgun sports generally involve firing from the shoulder. Additionally, the bayonet is a distinct military feature which has no sporting application.[21]

In addition to giving further explanation of the specific reasons for denying to Gilbert a permit to import the USAS–12, ATF spokesman Edward M. Owen has stated that ATF relied in part on Gilbert's own marketing and advertising literature, which listed the various combat uses of the weapon (but listed no recognizable sporting uses), in determining that the USAS–12 was not a sporting shotgun. The Bureau

---

**18.** The Bureau spokesmen note that traditional 12–gauge sporting shotguns on average weigh 7–8 pounds and rarely, if ever, exceed ten pounds.

**19.** In fact, ATF claims that the width of the drum magazine is similar to the drum-fed machine guns and other specialized weapons used by the military and law enforcement.

Gilbert notes that the agency's findings are somewhat misleading inasmuch as the width of the USAS with box magazine is only 1¾ inches.

**20.** The Bureau argues that a large magazine capacity and rapid reloading are military features.

Gilbert has indicated that ATF has falsely stated that the USAS–12 box magazine holds twelve shells. Instead, Gilbert states that a seven round magazine was produced for ATF's inspection. Additoinally, Gilbert argues that box magazines can be lengthened or shortened depending on desired shell capacity.

**21.** Gilbert has denied that the model it sent to ATF, for examination and testing to determine if the weapon is a sporting shotgun, was fitted with a bayonet lug.

argues that the representations, concerning the weapon, made by Gilbert in its advertising literature, together with the physical characteristics of the firearm, indicate that its determination to deny the application to import the weapon was rational, based on relevant factors, and was not a clear error in judgment.[22]

Finally, ATF was wholly unimpressed with the evidence Gilbert submitted with its February 17, 1988 letter requesting reconsideration of the agency's decision specifically finding: (1) that the tape demonstrating the firearm's uses did not provide comparisons of the USAS–12 with conventional sporting shotguns to demonstrate that it was of a type generally recognized as particularly suitable for or readily adaptable to the traditional shotgun sports of hunting and trap or skeet shooting; (2) that comparisons cannot be made between the USAS–12 and rifles or handguns because they are distinctly different weapons and thus it is immaterial that some of the handguns, rifles and "combination" rifle/shotguns the agency has allowed importation of share one or more features with the USAS–12 which the agency now finds objectionable; (3) although the agency has allowed importation of several military-style 12–gauge shotguns (e.g., the Benelli Scope–90, the Benelli VM, and the Benelli 212–M1), these shotguns maintain the basic features of traditional sporting shotguns; (4) the SPAS–12 is a traditional sporting shotgun adapted for military and

law enforcement use and was approved for importation in 1982 based upon an agency policy (a policy which recognized police combat competition as a sport) which has been subsequently reversed;[23] (5) the survey of state game commissions was directed to the legality of the use of the USAS–12 for hunting rather than to its suitability for sporting purposes; and (6) the evaluations made by Edward B. Crossman and Robert Sears did not address the salient physical features of the firearm which served as the basis of ATF's December 11, 1986 determination and neither stated that the USAS–12 is a shotgun "of a type" generally recognized as sporting or that the "sports" for which it is suitable are "generally recognized" sports.

D. *Decision.* It is clear to this Magistrate that the 1986 amendments to Section 925(d)(3) of the Gun Control Act were meant not only to liberalize importation of firearms but also to ease the burden on importers by eliminating the requirement that the importer satisfy the Secretary that the firearm sought to be imported is particularly suitable or readily adaptable to sporting purposes. Nevertheless, there is left the basic and undeniable requirement that the particular firearm sought to be imported must be particularly suitable or readily adaptable to sporting purposes.[24]

As this Court has heretofore noted, the Bureau of Alcohol, Tobacco and Firearms determined that due to the weight, size,

22. The Bureau claims that despite the plaintiff's evidence on the initial application from a number of people who wanted to use the weapon for deer hunting, target shooting, etcetera, it was reasonable for the agency to conclude that the firearm's predominant physical features (i.e., weight, size, etcetera) are not those of a sporting firearm. The agency argues that almost all firearms currently being manufactured have a conceivable sporting purpose but that this particular firearm is simply not of "a type [of firearm] ... generally recognized as particularly suitable for or readily adaptable to sporting purposes."

23. In 1982, ATF determined that a police combat competitions could be considered a "sport" under Section 925(d)(3) and found the Franchi SPAS–12 shotgun to be particularly suitable for that sport (A.R. 169). However, in 1984, ATF reversed that position and refused to classify the Striker–12 as a "sporting" weapon (A.R. 175).

The Bureau maintains that the policy change was made in 1984 because police combat competitions had not by 1984—and still have not—gained general recognition as "sports." ATF claims that due to administrative oversight, the importers of the Franchi SPAS–12 have continued to receive agency permission to import that firearm. However, on December 8, 1988, just one day prior to oral argument in this cause on the cross-motions for summary judgment, ATF sent a letter to the importers of the SPAS–12 informing them that future applications for importation of that firearm will be considered on a case-by-case basis.

24. This Court gives due deference to the agency's interpretation of Section 925(d)(3), inasmuch as there no compelling indications that said interpretation is wrong. *See, e.g., Smith, supra,* 766 F.2d at 1519.

bulk, designed magazine capacity, configuration and other factors, the USAS–12 semiautomatic shotgun is not particularly suitable for or readily adaptable to sporting purposes. Although the factors relied upon by ATF, to the Court's knowledge, have never been previously cited by ATF as factors determinative of the sporting purposes test, they are characteristic of all firearms and thus, the Magistrate opines that they are logical characteristics for ATF to consider in determining whether a particular firearm is particularly suitable for or readily adaptable to sporting purposes. Given the narrow standard by which this Court must judge agency decisions, *see, e.g., Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823–24, the undersigned Magistrate cannot determine that the Bureau's decision to deny permission to Gilbert to import the USAS–12 is arbitrary and capricious. The administrative record supports the agency's determination that the overall appearance and design of the weapon (especially the detachable box magazine and the pistol grip) is that of a combat weapon and not a sporting weapon. In fact, the USAS–12 was specifically marketed by Gilbert as a military and law enforcement weapon. Accordingly, the Magistrate finds that there was a rational relationship between the facts and the decision made by the Bureau not to allow the importation of the USAS–12, and therefore, the Court does not find the decision to be arbitrary or capricious. It is of no moment that the administrative record might also support the opposite conclusion that the USAS–12 is suitable for use as a sporting weapon.[25] This Court need only decide that a rational basis exists for the agency's decision and having done so, the Magistrate turns to Gilbert's remaining arguments.[26]

## II. MANDAMUS RELIEF.

In its complaint, plaintiff has also asserted that it is entitled to mandamus relief.

Mandamus is an extraordinary remedy which requires the coexistence of the following three elements before the writ may properly issue: "(1) a clear right in the plaintiff to the relief sought; (2) a clear duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available." *Carter v. Seamans,* 411 F.2d 767, 773 (5th Cir.1969), *cert. denied,* 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970); *District Lodge No. 166, International Ass'n of Machinists & Aerospace Workers v. TWA Services, Inc.,* 731 F.2d 711, 717 (11th Cir.1984), *cert. denied,* 469 U.S. 1209, 105 S.Ct. 1175, 84 L.Ed.2d 324 (1985). That is, the writ will issue "only if the act to be compelled is ministerial and so plainly prescribed as to be free from doubt." *Bass Angler Sportman Soc'y v. United States Steel Corp.,* 324 F.Supp. 412, 416 (S.D.Ala.1971), *aff'd sub nom. Bass Anglers Sportsman Soc'y v. Koppers Co.,* 447 F.2d 1304 (5th Cir.1971).

In the instant case, a reading of Section 925(d)(3) clearly indicates that before ATF must allow the importation of a firearm, said weapon must be shown to be particularly suitable or readily adaptable to sporting purposes. Inasmuch as this Court has already decided that the agency's decision that the USAS–12 is not particularly suitable or readily adaptable to sporting purposes is not arbitrary and capricious, the Magistrate certainly cannot find that there was a clear duty on the part of the defendant to grant Gilbert a permit to import the firearm.

## III. CONSTITUTIONAL CLAIMS.

*A. Fifth Amendment.* Gilbert alleges in its complaint that ATF has applied shifting, unequal standards, or no standards, and has continued to approve permits to import firearms less suitable for sporting purposes than the USAS–12 and by doing so, has violated its right to due process of

---

**25.** If ATF was not allowed to make distinctions between firearms and exclude those that are more clearly military than sporting, that agency would be reduced to a nonentity so far as importation under Section 925(d)(3) is concerned.

**26.** In deciding that ATF's decision was not arbitrary and capricious, this Court means to suggest that defendant's conclusion was warranted by the facts and was based on the facts born out by the administrative record. (*See* Count Three of the Complaint).

law and equal protection of the laws, rights guaranteed by the Fifth Amendment to the United States Constitution. To prevail on this claim, which essentially asserts that ATF unequally applied a facially neutral statute, Gilbert must prove intentional discrimination. *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 (11th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). "Unequal administration of facially neutral legislation can result from either misapplication (i.e., departure from or distortion of the law) or selective enforcement (i.e., correct enforcement in only a fraction of cases). In either case, a showing of intentional discrimination is required." *Id.* at 1113. "Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause." *Id.* at 1114, citing *Jurek v. Estelle*, 593 F.2d 672, 685 n. 26 (5th Cir.1979) (where plaintiff alleges "arbitrary and capricious" administration of statute, plaintiff still must prove intentional discrimination), *issue vacated without being addressed*, 623 F.2d 929, 931 (5th Cir.1980) (en banc), *cert. denied*, 450 U.S. 1014, 101 S.Ct. 1724, 68 L.Ed.2d 214 (1981). In the instant case, plaintiff has simply not proved that ATF intentionally discriminated against it in the agency's application of Section 925(d). It would simply be anomalous for this Court to find on the one hand that ATF's administration of Section 925(d) of the Gun Control Act was not arbitrary and capricious only then to find that ATF, in administering the statute, intentionally discriminated against Gilbert in violation of the equal protection clause of the Fifth Amendment.

Additionally, the Magistrate finds that Gilbert has neither sufficiently alleged or proven that a liberty or property interest was deprived by ATF's actions for the purpose of establishing a procedural due process violation. The Magistrate has some difficulty in surmising the exact property or liberty interest alleged here. In its complaint, Gilbert argues that ATF deprived it of its right to import the USAS–12 as a sporting weapon under Section 925(d)(3) of the Gun Control Act, as amended. Even if that Section arguably creates a right in a person to import arms, said right is activated only after the firearm sought to be imported is shown to be particularly suitable or readily adaptable to sporting purposes. Given this, the Magistrate cannot find that the statute creates an absolute right to relief sufficient to constitute a property or liberty interest. *See Thompson v. Dereta*, 549 F.Supp. 297, 299 (D. Utah 1982), *appeal dismissed*, 709 F.2d 1343 (10th Cir.1983).[27]

B. *Second Amendment.* The Second Amendment to the United States Constitution guarantees to all Americans the right "to keep and bear arms" and further provides that this right "shall not be infringed." U.S. Const. Amend. II. Plaintiff alleges that the right to keep and bear arms includes the right to manufacture, import, sell and purchase firearms and to the extent that 18 U.S.C. § 925(d)(3) allows ATF not to authorize importation of the USAS–12 on the ground that it is not a sporting shotgun, said code section infringes upon the right of the people to keep arms and is thus unconstitutionally void. In the context of this case, the Magistrate is concerned with whether the Second Amendment's right to keep arms necessarily involves the right to import firearms. The plaintiff, of course, desires to bootstrap the right to import firearms to the right to keep and bear arms. However, Gilbert has cited this Court to no authority, and the Court finds none, where it has been found that the right to keep and bear arms necessarily involves, or extends to, the right to import arms. Clearly, if this Magistrate was to declare 18 U.S.C. § 925(d)(3) constitutionally void, the Court would with one sweep of the pen destroy over twenty years of effort to keep undesirable firearms from flooding into the United States.

---

**27.** For a person to obtain a protectable property interest, he must "have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must instead, have a legitimate claim of entitlement to it."

*Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Gilbert has not proven that it has a legitimate claim of entitlement to the importation of the USAS–12 sufficient to create a property or liberty interest.

This, the Magistrate will not do. Accordingly, this Court finds that the right to keep and bear arms does not extend to and include the right to import arms and further finds that 18 U.S.C. § 925(d)(3) does not unconstitutionally impinge on the right to keep and bear arms.[28]

## CONCLUSION

Considering the foregoing discussion, the Magistrate recommends that the defendant's motion for summary judgment be granted and that plaintiff's cross-motion for summary judgment be denied.

The attached sheet contains important information regarding objections to this recommendation.

DONE this 12th day of January, 1989.

MAGISTRATE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1. *Objection.* Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the Clerk of this court. Failure to do so will bar later attack or review of anything in the recommendation. See 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir.1982) (*en banc*). The procedure for challenging the findings and recommendations of the Magistrate is set out in more detail in Local Rule 26(4)(b), which provides that:

> Any party may object to a magistrate's proposed findings, recommendations or report made under 28 U.S.C. § 636(b)(1)(B) within ten (10) days after being served with a copy thereof. The appellant shall file with the Clerk, and

serve on the magistrate and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate. The judge, however, need conduct a new hearing only in his discretion or where required by law, and may consider the record developed before the magistrate, making his own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate with instructions.

A Magistrate's recommendation cannot be appealed to a Court of Appeals; only the District Judge's order or judgment can be appealed.

2. *Transcript (applicable Where Proceedings Tape Recorded).* Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate finds that the tapes and original records in this case are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

**28.** That is, this court finds no absolute constitutional right of an individual to import firearms. *Thompson v. Dereta,* 549 F.Supp. 297, 299 (D. Utah 1982) *Cf.* ("There is no absolute constitutional right of an individual to possess a firearm."), *appeal dismissed,* 709 F.2d 1343 (10th Cir.1983); *United States v. Swinton,* 521 F.2d 1255, 1259 (10th Cir.1975) (in a criminal case, the defendant was convicted of engaging, without a license, in the business of dealing in firearms and the court in part held that there is no absolute constitutional right of an individual to possess a firearm), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976).