**GUN SOUTH, INC., Plaintiff–Appellee,**

v.

**Nicholas BRADY, Secretary of the Treasury; Stephen E. Higgins, Director of the Bureau of Alcohol, Tobacco and Firearms; William Von Rabb, Commissioner of the United States Customs Service, Defendants–Appellants.**

No. 89–7339.

United States Court of Appeals,
Eleventh Circuit.

June 30, 1989.

Mark B. Stern, Office of Atty. Gen., Civil Div., Washington, D.C., for defendants-appellants.

James C. Barton, Johnston, Barton, Proctor, Swedlaw & Naff, Robert S. Vance, Jr., Ralph H. Smith, Birmingham, Ala., for plaintiff-appellee.

Before FAY and HATCHETT, Circuit Judges, and HOFFMAN *, Senior District Judge.

HATCHETT, Circuit Judge:

The Secretary of the Treasury, the Director of the Bureau of Alcohol, Tobacco and Firearms, and the Commissioner of the United States Customs Service (collectively "the Government") appeal the district court's grant of an injunction to Gun South, Inc. ("GSI"). The district court ordered the Government to deliver to GSI rifles which had been approved for importation, but held by Customs upon arrival at the Birmingham, Alabama Airport. 711 F.Supp. 1054. For the reasons discussed below, we reverse the district court's decision and vacate the injunction.

## FACTS

GSI is a wholesale gun dealer which the Bureau of Alcohol, Tobacco and Firearms ("the Bureau") has licensed to import firearms. In September, 1988, and February, 1989, GSI applied for permits to import Steyr–Mannlicher AUG semi-automatic rifles (AUG–SA rifles) because GSI learned that the Bureau had previously approved the importation of these rifles as firearms with a sporting purpose. Pursuant to its practice of routinely granting permits for previously imported firearms, the Bureau issued GSI two permits. On October 4, 1988, the Bureau granted GSI a permit to import 1,700 AUG–SA rifles, and on February 22, 1989, the Bureau approved GSI's application to import an additional 3,000 AUG–SA rifles.

On January 23, 1989, GSI ordered 800 AUG–SA rifles and certain accessories under its October 4 permit. GSI obligated itself to pay $700,000 toward a larger total purchase price, and GSI's bank guaranteed these funds.

On March 21, 1989, William Bennett, Director of the Office of National Drug Policy, speaking for the Secretary of the Treasury, announced a temporary suspension on the importation of five "assault-type" weapons, including the AUG–SA rifle. On March 29, 1989, the Bureau expanded the scope of the suspension to cover all assault-type weapons "indistinguishable in design, appearance and function to the original five." The Government imposed the temporary suspension to allow the Bureau to reassess its approval of several applications to import the suspended rifles. Under an accelerated review, the Bureau will review each permit to determine if it erroneously concluded that the rifles are "generally suitable for a sporting purpose." The Bureau will not revoke the permits before giving the affected importers notice and an opportunity to respond.

GSI requested a clarification of whether the suspension applied to weapons purchased under preexisting permits. In response to this inquiry, the Bureau informed GSI, at least twice, that the ban did not apply to weapons purchased under preexisting permits, but rather, the suspension only prevented the issuance of new permits. Despite these assurances, the Customs Service interdicted GSI's shipment of

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

AUG–SA rifles at the Birmingham Airport even though GSI purchased such rifles under a permit issued prior to the suspension. Although the Government agreed to allow GSI to obtain custody of the AUG–SA rifles if GSI posted a bond guaranteeing that it would not resell or distribute such weapons, GSI declined such offer and brought this action.

## PROCEDURAL HISTORY

On March 30, 1989, GSI filed this action in the Northern District of Alabama seeking a declaratory judgment, and preliminary and permanent injunctive relief. GSI sought to enjoin the Government from interfering with the delivery of firearms imported under its permits issued prior to the temporary suspension. On April 7, 1989, the district court consolidated GSI's preliminary injunction motion with a final adjudication of the merits of GSI's claims pursuant to Fed.R.Civ.P. 65(a)(2). Both sides provided further evidence and legal briefs.

On April 26, 1989, the district court denied the Government's summary judgment motion and issued a permanent injunction "enjoin[ing] any interference with the routine delivery of any and all weapons ordered by Gun South, Inc. in accordance with the terms and conditions of permits issued by [the Bureau] prior to the promulgation of the notice or notices of suspension purporting to affect the importation of the [firearm in question]." The district court found that the Government failed to present any evidence that the AUG–SA is not "generally recognized as particularly suitable or readily adaptable to sporting purposes." The court also found that the evidence demonstrated that the AUG–SA has the design of a sporting weapon. Based on these findings, the district court held that section 925(d)(3) of the Gun Control Act precluded the temporary suspension. *See* 18 U.S.C.A. § 925(d)(3) (West 1976) (compels the Secretary of the Treasury to authorize the importation of firearms "generally recognized as particularly suitable for or readily adaptable to sporting purposes."). After the district court concluded that GSI lacked an adequate legal remedy to redress any harm incurred from the suspension, the court ordered the Customs Service to release GSI's weapons for immediate delivery. Because the district court found the suspension unlawful, the court did not address GSI's constitutional challenges to the Government's actions.

On April 28, 1989, the district court denied the Government's motion for a stay pending appeal. On the same day, this court granted a temporary emergency stay pending the court's further action. On May 3, we extended the stay pending appeal and expedited the Government's appeal.

## CONTENTIONS

The Government contends that the district court erred by concluding that the Bureau did not lawfully suspend the importation of the AUG–SA rifle for ninety days. The Government contends that section 925(d)(3) does not preclude it from temporarily suspending the importation of firearms while it conducts an accelerated reassessment of the importability of such firearms. In addition, the Government maintains that it did not act arbitrarily or capriciously because the suspension is rationally related to fulfilling its mandate of precluding the importation of unauthorized firearms.

The Government further contends that even if GSI has a vested property interest in the permits, the temporary suspension does not violate GSI's constitutional rights. According to the Government, the temporary import suspension does not violate GSI's due process rights because the strong public interest in immediate action outweighs the limited impact on GSI's alleged property interest. Moreover, the Government contends that GSI cannot establish a valid taking claim because: (1) this court lacks jurisdiction over GSI's equitable claim to enjoin the alleged taking; and (2) the Government's temporary deprivation of the rifles does not constitute a compensable taking.

GSI contends that the district court properly concluded that section 925(d)(3) prevents the Government from suspending the

importation of the AUG–SA rifle because the Bureau previously classified this rifle as a sporting firearm, and the Government has failed to present any evidence to demonstrate that this classification is erroneous. Beyond the Gun Control Act, GSI contends that the Act's implementing regulations also preclude the suspension.

Even if the Government has the authority to suspend the importation of the AUG–SA rifles, GSI alternatively contends that the Government arbitrarily and capriciously imposed the suspension by making an uninformed decision without any supporting evidence. Finally, GSI contends that the Bureau's imposition of the suspension violates its fifth amendment procedural due process rights and constitutes an unconstitutional taking.

### ISSUES

The sole issue which the Government raises on appeal is whether the district court improperly enjoined the Government from temporarily suspending the importation of GSI's AUG–SA rifles purchased under permits which the Bureau approved prior to the Government's announcement of the import suspension.

### DISCUSSION

We begin our analysis by emphasizing the deferential standard of review that we must apply when examining an agency's action. We may set aside the Bureau's temporary import suspension of AUG–SA rifles only if we find that such action: (1) exceeds the Bureau's statutory authority, (2) violates a constitutional right, or (3) constitutes an "arbitrary" or "capricious action," or "an abuse of discretion" or an action "otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C.A. § 706(2)(A), (B), and (C) (West 1977). Under this deferential standard, we cannot substitute our judgment for the Bureau's judgment, but rather, we must presume the import suspension's validity. *Manasota–88, Inc. v. Thomas,* 799 F.2d 687, 691 (11th Cir.1986). With this standard in

mind, we address GSI's multipronged attack of the temporary import suspension.

### I. *Lawfulness of the Temporary Suspension*

The district court enjoined the Government's actions because it concluded that the Gun Control Act and its implementing regulations prohibit the Bureau from temporarily suspending the importation of the AUG–SA rifles. GSI contends that the district court properly interpreted the Gun Control Act and its regulations. In contrast, the Government contends that its temporary import suspension does not exceed the Gun Control Act or its implementing regulations and that the evidence illustrates the reasonableness of such action.

### A. *The Authority for the Temporary Suspension*

■ The Gun Control Act gives the Secretary of the Treasury the power to enforce its provisions.[1] The Act generally forbids the Secretary from authorizing the importation of firearms into the United States. 18 U.S.C.A. § 922(1) (West 1976). The Act, however, creates four narrow categories of firearms which the Secretary must authorize for importation. 18 U.S.C.A. § 925(d) (West 1976 and Supp.1989). Under the only exception relevant to this controversy, the Secretary of the Treasury must authorize the importation of firearms

of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and is *generally recognized as particularly suitable for or readily adaptable to sporting purposes,* excluding surplus military firearms, except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.

18 U.S.C.A. § 925(d)(3) (West 1976 and Supp.1989) (emphasis added).

---

1. The Secretary of Treasury has delegated this authority to the Bureau. *See* 27 C.F.R. § 178.12 (1988) (no importation of firearms without authorization from the Bureau).

We must first determine whether the Act or its regulations authorize or prohibit the suspension. Contrary to the district court's conclusion, we believe that no provision precludes the suspension but rather, the Act impliedly authorizes such action.

GSI correctly notes that neither the Act nor its regulations explicitly authorizes the suspension. Despite this absence of express authority, we conclude that the Bureau must necessarily retain the power to correct the erroneous approval of firearms import applications. As discussed above, the Act strictly limits the importation of firearms to those which satisfy one of the four exceptions. 18 U.S.C.A. § 922(1) (West 1977). To accomplish this task, the Bureau inherently must possess the corollary power to temporarily suspend the importation of firearms under permits which the Bureau may have erroneously granted. Otherwise, gun companies could legally inundate the country with rifles which Congress intended to forbid from entering our borders. We decline to interpret the Act in a way which produces such a nonsensical result.

Beyond this common sense rationale, we find support for this implied authority in the legislative history. Several portions of the legislative history emphasize Congress's intent to ban the importation of firearms, and the Secretary's discretion in complying with this mandate. The Senate report to the Gun Control Act of 1968 provides that "[t]he existing Federal controls over interstate and foreign commerce in firearms are not sufficient to enable the states to effectively cope with firearms traffic within their own borders...." Sen.R. 1097, 90th Cong., 2d. Sess. 80, *reprinted in* 1968 U.S.Code Cong. & Admin. News 2112, 2167. In addition, the Senate report explains that Congress intended section 925(d)(3) to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting" to prevent such weapons being used for criminal means. S.Rep. No. 1097, 90th Cong., 2d Sess. 80, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2167. Furthermore, the sponsor of the legislation, Senator Dodd, stated:

> Title IV prohibits importation of arms which the Secretary determines are not suitable for research, sport, or as museum pieces.... The entire intent of the importation section is to get those kinds of weapons that are used by criminals and that have no sporting purpose.

114 Cong.Rec. S 5556 column 3, S 5582 column 1, S 5585, column 2 (May 14, 1968). These remarks illustrate Congress's intent absolutely to bar the importation of firearms outside of the narrow statutory exceptions. Given this purpose, we believe that Congress intended the Secretary to retain the necessary authority to comply with this mandate, including the power to temporarily suspend imports under potentially erroneous permits.

As further support for our conclusion, we note that the Supreme Court and other courts have recognized an implied authority in other agencies to reconsider and rectify errors even though the applicable statute and regulations do not expressly provide for such reconsideration. For example, in concluding that the Interstate Commerce Commission ("ICC") could order a refund to correct a prior error, the Supreme Court stated that "[a]n agency, like a court, can undo what is wrongfully done by virtue of its order." *United Gas Improvement Co. v. Callery Properties*, 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284, 289 (1965); *see also American Trucking Assoc. v. Frisco Trans. Co.*, 358 U.S. 133, 145, 79 S.Ct. 170, 177, 3 L.Ed.2d 172, 180–81 (1958) ("the presence of authority in administrative offices and tribunals to correct [inadvertent ministerial] errors has long been recognized—probably so well that little discussion has ensued in the reported cases."). Other courts have similarly recognized this implied authority. *See Iowa Power and Light Co. v. United States*, 712 F.2d 1292, 1294–97 (8th Cir. 1983) (ICC could retroactively impose higher tariff to correct legal error), *cert. denied*, 466 U.S. 949, 104 S.Ct. 2150, 80 L.Ed. 2d 536 (1984); *Bookman v. United States*, 453 F.2d 1263, 1265, 197 Ct.Cl. 108 (1972) (allowing agency to reconsider decisions in

absence of statutory or regulatory authorization after noting general rule that "[e]very tribunal, judicial or administrative, has some power to correct its own errors or otherwise appropriate to modify its judgment, decree, or order.") (quoting 2 K. Davis, *Administrative Law Treatise*, § 18.09 (1958)). Finally, some courts have specifically relied on this implied authority to allow an agency to revoke a license. *Kudla v. Modde*, 537 F.Supp. 87, 89 (E.D. Mich.1982), "([t]he power of the state to require a license implies the power to revoke a license which has been improperly issued."), *aff'd without opinion*, 711 F.2d 1057 (6th Cir.1983); *Century Arms, Inc. v. Kennedy*, 323 F.Supp. 1002, 1016–17 (D.Vt. 1971), ("We are aware of no licenses which once granted, can never be taken away.") *aff'd*, 449 F.2d 1306 (2d Cir.1971), *cert. denied*, 405 U.S. 1065, 92 S.Ct. 1494, 31 L.Ed.2d 794 (1972).

The district court and GSI, however, refuse to imply such authority because they interpret section 925(d)(3) as expressly prohibiting the suspension. We do not interpret section 925(a)(3) so broadly.

Section 925(d)(3) requires the Secretary to authorize the importation of a firearm which is generally recognized as particularly suitable for sporting purposes. We agree with the district court that this section unambiguously requires the Secretary to authorize the importation of sporting firearms. But we decline to adopt the district court's broader interpretation of this section as precluding a temporary suspension until the Bureau proves that the rifles are not sporting firearms. First, we believe that such an interpretation "places the cart before the horse"; the Bureau must decide whether a firearm is generally suitable for a sporting purpose before the Act requires the Secretary to authorize such a rifle's importation.

Second, the Bureau and the Secretary of Treasury do not interpret this section as prohibiting a temporary ban. Because we do not believe the language of section 925(a)(3) compels a different interpretation, we should defer to their interpretation. *See Callaway v. Block*, 763 F.2d 1283, 1287

(11th Cir.1985) ("construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong").

Third, the legislative history supports our interpretation. The Senate Report notes that the Act gives the Secretary of the Treasury unusually broad discretion in applying section 925(d)(3):

> The difficulty of defining weapons characteristics to meet this target [of eliminating the importation of weapons used in crime], without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition. ...

S.Rep. No. 1501, 90th Cong., 2d Sess. 38 (1968). In fact, such broad discretion was a major concern of the opponents of the bill:

> The proposed restrictions of Title IV would give the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes. ...

S.Rep. No. 1097, 90th Cong., 2d Sess. 255 (April 29, 1968), *reprinted in* 1968 U.S. Code Cong. & Admin.News at 2306 ("individual views of Messrs. Dirksen, Hruska, Thurmond and Burdick on Title IV"). Because the Bureau has significant discretion in administering the Gun Control Act, we do not believe that Congress intended section 925(d)(3) to prevent the Bureau from temporarily suspending imports which may be unlawful under the Act.

The district court and GSI cite the 1986 amendment to the Gun Control Act as support for their interpretation of section 925(d)(3). We, however, agree with the Bureau that the 1986 amendment does not compel us to adopt the district court's interpretation. The 1986 amendment substituted the word "shall" for "may" in section 925(d), and therefore, mandated the Secretary to authorize the importation of firearms falling within one of the four excepted categories. Firearm Owners Protection

Act, P.L. 99–308, 100 Stat. 459 (1986) (codified as amended at 18 U.S.C.A. § 925(d) (West 1988); H.Rep. No. 495, 99th Cong., 2d Sess. at 14 (1986), *reprinted in* 1986 U.S.Code Cong. & Admin.News 1327, 1340 (the 1986 amendment "[o]pens up the importation of firearms by mandating the Secretary to authorize importation of a firearm if there is a sporting purpose and eliminat[es] the requirement that the importer has the burden of satisfying the Secretary of the sporting purpose...."). As discussed above, while we acknowledge this mandatory language, we do not believe that such language prohibits the Bureau from temporarily suspending the importation of certain firearms while reassessing whether such firearms have a sporting purpose. As the senate report notes, "it is anticipated that in the vast majority of cases, [the substitution of 'shall' for 'may' in the authorization section] will not result in any change in current practices." S.Rep. No. 98–583, 98th Cong., 1st Sess. 27 (1984). Thus, we conclude that section 925(d)(3) does not expressly preclude the temporary suspension.

Turning to the implementing regulations, GSI contends that the regulations also prohibit the Government's actions. We disagree.

The Secretary promulgated regulations which prescribe procedures for importing firearms. Under the regulations, gun companies must apply for a permit to import firearms. 27 C.F.R. § 178.112 (1988). If the Bureau approves the permit, the licensed importer may import the quantity of firearms specified in the application for the period of time stated in the application. 27 C.F.R. § 178.112 (1988).

According to GSI, the following regulation unambiguously prohibits the temporary import suspension:

> If the Director [of the Bureau] approves the application, such approved application shall serve as the permit to import the firearm, firearm barrel, or ammunition described therein, and *importation of such firearms, firearm barrels, or ammunition may continue to be made by the licensed importer under the ap-*

*proved application (permit) during the period specified thereon.* [Emphasis added.]

27 C.F.R. § 178.112. This regulation does not unambiguously proscribe the Bureau from temporarily suspending firearms imports. Rather than expressly precluding such action, the regulation merely explains the consequences of the Bureau's *proper* approval of a firearm import application.

Even if the regulation does not unambiguously preclude the suspension, GSI argues that the regulation's failure to explicitly authorize the Bureau to suspend a valid permit demonstrates that the Bureau does not have the authority to temporarily suspend GSI's permits. According to GSI, where the Bureau has retained authority to suspend or revoke such permits, it has implemented explicit regulations which recognize such authority. *See* 27 C.F.R. § 47.44 (1988) (explicitly granting the Bureau the right to deny, revoke, suspend or revise permits found to be inconsistent with or violating the Arms Export Control Act of 1976; 27 C.F.R. §§ 178.71–178.78 (1988) (regulations establishing a procedure for suspending or revoking a license in accordance with 18 U.S.C. § 923). The Secretary's creation of express procedures for revoking or suspending permits under a different statute does not compellingly indicate that the Bureau did not intend to establish such a right to temporarily suspend permits under the Act. Similarly, the Secretary's imposition of procedures for revoking a license does not convince us that its failure to expressly authorize the Bureau to suspend a permit indicates its intent to preclude such action.

More importantly, the Secretary urges this court not to interpret this regulation as precluding the temporary suspension. We must defer to the Bureau's interpretation of the Gun Control Act and its regulations absent plain error in the Bureau's interpretation. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965) (court should follow agency's interpretation unless "there are compelling indications that it is wrong"); *Veterans Administration Medical Center v. FLRA,*

675 F.2d 260 (11th Cir.1982); *Bowles v. Seminole Rock and Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702 (1945) (administrative interpretation is the ultimate criterion for interpreting an administrative regulation and such interpretation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation"). Because we do not find the Secretary's interpretation plainly erroneous, but rather we find it more valid than GSI's interpretation, we reject GSI's contention that the Bureau's regulations preclude the temporary suspension.

### B. *Reasonableness of the Temporary Suspension*

Having established that the Secretary has the authority to temporarily suspend the importation of semi-automatic assault rifles, we must determine the reasonableness of such action. In making this determination, we will defer to the Bureau's suspension unless we find it arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1977).

### 1. *Accordance with Law*

█ By arguing that the imposition of the temporary suspension without conducting a hearing violates the Gun Control Act's and the Administrative Procedure Act's ("APA") procedural rules, GSI essentially argues that the temporary suspension is "otherwise not in accordance with law." The Government responds to this attack by arguing that the procedural provisions on which GSI relies do not apply to the temporary suspension. We find the Government's argument persuasive.

First, GSI argues that the imposition of the suspension without a hearing violates section 926(b) of the Act. Section 926(b) requires the Secretary to give notice and an opportunity to be heard prior to promulgating regulations. *See* 18 U.S.C.A. § 926(b) (West Supp.1989). This section only applies when the Secretary engages in rulemaking.

The Bureau has not engaged in rulemaking, but has merely suspended certain firearms from importation while it individually reassesses several permit determinations. These activities which involve applying the law to the facts of an individual case, do not approach the function of rulemaking. *See York v. Secretary of Treasury*, 774 F.2d 417, 420 (10th Cir.1985) ("classification" of firearm as machine gun is "not a rulemaking of any stripe."). Such a determination is more analogous to making a licensing decision which the APA classifies as an "order" rather than a "rule." *See* 5 U.S.C. §§ 551(6), (7) & (9) (defining "licensing" as "agency process respecting the grant, renewal, denial, revocation, *suspension*, amendment, withdrawal, limitation, amendment ... of a license."). Thus, because these actions do not constitute rulemaking, the Bureau did not violate section 926(b).

Second, we reject GSI's argument that the Government violated the APA by imposing the suspension without a hearing. Under the APA, an agency must provide notice and an opportunity to respond before revoking a license. 5 U.S.C.A. § 558 (1977). As discussed above, the Bureau has not revoked GSI's license or its permits; import suspension does not constitute rulemaking; therefore, the suspension does not violate the APA's procedural requirements.

### 2. *Arbitrary, Capricious or Abuse of Discretion*

█ Even if the Bureau's suspension does not specifically conflict with the Act or any other laws, GSI argues that the district court properly enjoined the Government's actions because the Bureau arbitrarily and capriciously imposed the suspension. GSI relies on two alternative grounds for reaching this conclusion: (1) the AUG–SA rifle has not physically changed and (2) the Bureau lacks any evidence to support its "drastic" actions. Neither prong of this argument has any merit.

Initially, we reject GSI's argument that the Bureau acted arbitrarily and capriciously by imposing the suspension because the

AUG–SA rifle has not physically changed. This argument places too much emphasis on the rifle's structure for determining whether a firearm falls within the sporting purpose exception. While the Bureau must consider the rifle's physical structure, the Act requires the Bureau to equally consider the rifle's use. The term "generally recognized" in section 925(d)(3) suggests a community standard which may change over time even though the firearm remains the same. Thus, a changing pattern of use may significantly affect whether a firearm is *generally recognized* as *particularly suitable* for or *readily adaptable to* a sporting purpose.

In addition, the Bureau has interpreted section 925(d)(3) as requiring an inquiry of the firearms' actual use in addition to its physical characteristics. *See Gilbert Equip. Co. v. Higgins*, 709 F.Supp. 1071 (S.D.Ala.1989) (upholding Bureau's denial of permit despite its granting permits for similar firearms because Bureau changed its view of scope of sporting purposes). Because we find this interpretation reasonable, we defer to it. *See Callaway*, 763 F.2d at 1287 (requiring adherence to agency's construction of statute absent compelling indication of error). Thus, the temporary suspension is not arbitrary and capricious simply because the rifle has not changed.

We similarly find no merit in GSI's contention that the Bureau imposed the suspension in such a manner and so totally without evidence that we should not defer to the Government's action. *See SEC v. Sloan*, 436 U.S. 103 at 117–18, 98 S.Ct. 1702 at 1711–12, 56 L.Ed.2d 148 at 160–61 (1978) ("one factor to be considered in giving weight to an administrative ruling is the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking in power to control."). According to GSI, the following circumstances demonstrate that the Bureau made a hurried and uninformed decision: (1) the Bureau did not evaluate or deliberate the situation; (2) the Bureau did not have any data showing that imported

semi-automatic rifles or the AUG–SA rifle contribute to crime; (3) the Bureau did not consult its experts who routinely identify sporting firearms; and (4) the Bureau made its decision without considering its legal obligations under the Act and its implementing regulations.

Contrary to this assertion, we believe that the Bureau adequately considered sufficient evidence before imposing the temporary suspension. In Director Higgins's declaration, he explains: (1) law enforcement agencies and officials reported a dramatic proliferation in the use of assault-type rifles in criminal activity; (2) the Bureau's tracings branch showed a 57–percent increase in traces of assault-type rifles recovered from crime scenes; (3) several highly publicized murders in which assault rifles were used indicate their increased use in criminal activity; and (4) the Bureau's statistics revealed the smuggling of substantial numbers of firearms out of this country for use in foreign crime. This evidence sufficiently supported the Bureau's reassessment of certain permits; therefore, the district court clearly erred in finding that the Government did not present any evidence indicating that the AUG–SA rifles may not have a generally recognized sporting purpose.

Because the Bureau issued permits to allow the importation of 640,000 rifles and had 136,000 applications pending for additional rifles, the Bureau could reasonably conclude that it needed to impose a temporary suspension to avoid a saturation of potentially illegal assault-type rifles. We emphasize that we are not reviewing the Bureau's revocation of the permits, but only its ninety-day suspension. Thus, the Government did not act arbitrarily and capriciously by imposing the temporary suspension while it conducts an accelerated review of its grant of several permits; rather, the Government acted reasonably to comply with its duty of prohibiting the importation of firearms under the Gun Control Act.

## II. *Constitutional Claims*

Beyond the above claims, GSI attacks the suspension by arguing that it violates its

due process rights and constitutes a taking of property without the payment of just compensation. In response, the Government argues that its temporary import suspension does not infringe upon any of GSI's constitutional rights. We agree.

### A. Procedural Due Process Claim

■ According to GSI, the Government's failure to give it notice of the suspension and an opportunity to respond prior to imposing the suspension deprived GSI of its due process rights.[2] GSI reaches this conclusion by arguing that the Government may not deprive an individual of property without giving such individual an opportunity to be heard. Although GSI correctly argues the general rule, GSI fails to recognize that the Constitution does not always require such predeprivation procedural protection. *Hodel v. Virginia Surface Mining and Reclamation Assoc.*, 452 U.S. 264, 300, 101 S.Ct. 2352, 2372, 69 L.Ed.2d 1, 31 (1981) ("summary administrative action may be justified in emergency situations."). *See Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979) (pending prompt judicial or administrative hearing to determine issue, state's board could properly temporarily suspend horse trainer's license prior to hearing); *Ewing v. Mytinger and Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (allowing seizure of misbranded articles by enforcement agency prior to hearing).

Rather than setting categories of mandatory procedural protections in all cases, the Supreme Court decides the nature and timing of the requisite process in an individual case by accommodating the relevant competing interests. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265, 277 (1982) (quoting *Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725, 737 (1975)).

The Supreme Court's balancing test essentially requires us to weigh three factors: (1) the nature of the private interest; (2) the risk of an erroneous deprivation of such interest; and (3) the government's interest in taking its action, including the burdens that any additional procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). Balancing these considerations, we conclude that the Bureau's summary action did not violate GSI's due process rights.

The Bureau imposed the temporary suspension to protect the public by ensuring that nearly three-quarters of a million rifles do not improperly enter the country. The protection of the public's health and safety is a paramount government interest which justifies summary administrative action:

> Protection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action. Indeed, deprivation of property to protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action.

*Hodel*, 452 U.S. at 300, 101 S.Ct. at 2373, 69 L.Ed.2d at 31 (quoting *Ewing*, 339 U.S. at 599, 70 S.Ct. at 873, 94 L.Ed. at 1093) (safety concerns justified summary seizure of vitamin product). The public interest in avoiding the importation of possible illegal assault rifles which could contribute significantly to this country's violent crime epidemic is clearly substantial, especially given the large number of rifles approved for importation under the current outstanding permits. The Government could not protect the public interest without imposing the temporary suspension.

On the other side of the balancing equation, we consider the nature of the private interest, including the deprivation's length and finality. *See Logan*, 455 U.S. at 434, 102 S.Ct. at 1157, 71 L.Ed.2d at 277. GSI has not suffered a permanent loss because the Government has not revoked GSI's license or its permits. The Government has merely deprived GSI of the ability to import the AUG–SA rifle for ninety days.

---

**2.** The parties dispute whether the right to import firearms under a permit constitutes a property interest. Because GSI has more than the mere "right to import," we assume a property interest for the purpose of deciding this expedited case.

The Government has further reassured the court that it will not revoke GSI's permits without giving GSI the right to participate in a hearing.

In addition to being a non-final, temporary deprivation, the ninety-day suspension does not affect a significant portion of GSI's imports. The rifles which GSI seeks to import during this ninety-day period are only a small percent of the number of firearms it plans to import under its permits this year, and the importation of the Steyr rifles constituted only 20–percent of GSI's import inventory in 1988.

Considering the final factor, we do not find that the Government's summary action presents a significant risk of an erroneous deprivation of GSI's right to import the rifles. First, GSI only loses its right to import the rifles for ninety days. Second, as discussed above, the Bureau considered ample evidence before imposing the temporary suspension, and therefore, it minimized the risk that its actions would erroneously deprive GSI of its right to import the AUG–SA rifles.

Balancing GSI's temporary non-final loss of its right to import one type of rifle against the Government's interest in preventing the unlawful importation of firearms, we conclude that the Government did not err by suspending the importation of the AUG–SA rifle prior to giving GSI an opportunity to respond. The strong public interest in the immediate action outweighs the temporary and limited impact on GSI's alleged property interest. We find support for this decision in other cases which have subordinated more substantial property interests to the Government interest in protecting the public. See Mackey v. Montrym, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979) (although license to operate motor vehicle is substantial property interest, the substantial nature of such interest is diminished measurably by maximum duration of suspension being ninety days and availability of immediate post-suspension hearing). Furthermore, the availability of a hearing at the end of this temporary suspension provides adequate procedural protection. See Hodel, 452 U.S. at 303, 101

S.Ct. at 2374, 69 L.Ed.2d at 33 (summary administrative action justified where adequate post-deprivation hearings providing opportunity for judicial review exist). Thus, the summary imposition of the import suspension does not violate GSI's due process rights.

## B. *Taking Claim*

■ GSI finally contends that the temporary suspension constitutes a taking of property without just compensation. The Government argues that GSI cannot pursue this claim in this court but must assert this claim in a damages suit in the Claims Court. In the alternative, the Government contends that the temporary suspension does not constitute a taking. We conclude that GSI must bring this claim in the Claims Court.

GSI concedes that it cannot maintain an action for injunctive relief if it may subsequently bring an action for damages against the Government under the Tucker Act. GSI contends, however, that it lacks a post-deprivation damages remedy under the Tucker Act because neither the Constitution or any statute authorizes the Government's actions. See Regional Rail Reorganization Cases, 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 350 n. 16, 42 L.Ed.2d 320, 344 n. 16 (1974) (injunctive relief available where owner proves that government officials lack lawful authority to take property). This contention has no merit. As the above discussion demonstrates, the Government has the authority to temporarily suspend the importation of GSI's firearms under the Gun Control Act. Moreover, Congress has not expressed an intention to preclude Tucker Act jurisdiction over a claim for compensation under the Gun Control Act; therefore, GSI can seek damages under the Tucker Act. Ruckelshaus v. Monsanto Company, 467 U.S. 986, 1017, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815, 841 (1984) (Tucker Act remedy available unless "Congress has in the [statute] withdrawn the Tucker Act grant of jurisdiction to the Court of Claims...."). Because GSI can bring a claim under the Tucker Act, it cannot seek an injunction to prevent a taking in this court. Ruckelshaus, 467 U.S. at

1019, 104 S.Ct. at 2881, 81 L.Ed.2d at 843 (suit for equitable relief to enjoin alleged taking not ripe where the taking claim is remedial under the Tucker Act).

■ Even if we had jurisdiction to consider this claim, we note that the temporary suspension does not constitute a taking. In deciding whether a taking exists, we consider: "the character of the governmental action, its economic impact, and its interference with reasonable investment backed expectations." *Ruckelshaus,* 467 U.S. at 1004, 104 S.Ct. at 2873, 81 L.Ed.2d at 833 (quoting *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741, 753 (1980)). First, the Government has acted in a purely regulatory capacity and does not profit from its actions. Second, the Government has neither permanently nor totally deprived GSI of any property because the Government has only temporarily suspended the importation of such rifles. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (regulation of property is a taking only when regulation goes too far). Finally, even though GSI may have had a reasonable investment-backed expectation, GSI does not demonstrate that the suspension will unreasonably impair the value of the rifles. *See Pruneyard Shopping Center,* 447 U.S. at 83, 100 S.Ct. at 2042, 64 L.Ed.2d at 753 (no taking where regulation will not unreasonably impair value of regulated property). Thus, no compensable taking has occurred. We therefore reject GSI's constitutional attacks on the temporary suspension.

## CONCLUSION

Because we conclude that the suspension does not exceed the Bureau's statutory authority, does not constitute an arbitrary or capricious action, and does not violate GSI's constitutional rights, we reverse the district court's decision and vacate its injunction enjoining the Government from temporarily suspending the importation of the AUG–SA rifles.

REVERSED and REMANDED.

HOFFMAN, Senior District Judge, dissenting:

With regret I feel compelled to dissent, only because I am obliged to yield to the Congress even though I may personally feel to the contrary.

Section 925(d)(3) of the Gun Control Act, 18 U.S.C. § 925, prior to the amendment of 1986, provided that "the Secretary *may* authorize a firearm or ammunition to be imported or brought into the United States or any possession thereof if the person importing or bringing in the firearm or ammunition establishes to the satisfaction of the Secretary that the firearm or ammunition ... (3) is of a type that ... is generally recognized as particularly suitable for or readily adaptable to sporting purposes...." The permits approved for the guns in controversy were dated October 4, 1988 and February 21, 1989. The life of each import permit is six months; one having expired on April 4, 1989; the other due to expire the latter part of August, 1989.

On May 19, 1986, the Congress enacted P.L. 99–308, the Firearms Owners' Protection Act of 1986. This Act amended § 925(d)(3) of the Gun Control Act by substituting the word "shall" for "may," and removing from importers the burden of proving that firearms are suitable for sporting purposes. Indeed, if the Secretary has any question as to whether the firearm may be imported into the United States, 18 U.S.C. § 925(d) further provides:

The Secretary shall permit the conditional importation or bringing in of a firearm or ammunition for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm or ammunition will be allowed under this subsection.

Thus, before approving a permit Congress has said that the Secretary may conditionally import a firearm to conduct the appropriate testing, etc. More importantly, however, Congress has made it mandatory for the Secretary to authorize firearms to be imported when the permits are approved. In this case, all parties are in

agreement that the permits were regularly and properly approved prior to the announcement of the ban on March 13, 1989. The issue in my mind is whether the Secretary, as the head of an agency, may take steps by way of a temporary suspension of permits, already approved, which action, if successful, will render nugatory the express intention of the Congress to authorize the importation. While I hold no brief for some legislation enacted by the Congress, and am fully aware of the special interest pressure which obviously existed when the 1986 amendment was enacted, I have always felt that it was my duty to adhere to the will of Congress wherever the Congress clearly had the jurisdiction and power to act, as it did in this situation.

The majority expresses the view that, despite the 1986 amendment, a temporary suspension for the purpose of reassessing whether the firearms have a sporting purpose is not prohibited. The legislative history does not, in my opinion, justify the foregoing conclusion even though the majority cites a Senate Report, S.Rep. No. 98–583, 98th Cong., 1st Sess. 27 (1984), stating that in the vast majority of cases the use of the mandatory word "shall" will not result in a change of practice. That statement of the majority is correct until we meet, as we now do, a conflict with the circumvention by an agency of what Congress has heretofore provided. A Senate Judiciary Committee reported, 98th Cong., 2d Sess., at 27 (1984), that

> [t]he Committee amendment requires the Secretary to authorize the importation of firearms in the listed categories.

Speaking to the same subject, the House Judiciary Committee, House Rec. No. 495, 99th Cong., 2d Sess., at 14 (1986), reprinted in 1986 U.S.Code Cong. & Admin.News 1327, 1340, recognized the "problem" and said that the liberalization of the importation of firearms:

> Opens up the importation of firearms by mandating the Secretary to authorize importation of a firearm if there is a sporting purpose and eliminating the requirement that the importer has the burden of satisfying the Secretary of the sporting purpose....

When the later permit expires in the latter part of August, the Secretary would have essentially accomplished what he contemplated doing when he issued the ban on March 13, 1989. True, there may have been a taking—an issue not now decided— but the firearms need no longer be received for importation. I do not disagree with the majority in their expression of the strong public interest in immediate action, but this action is not limited to the firearms purchased under two permits regularly issued and approved, but not yet delivered to the owner because of the temporary suspension, said to be 90 days but vague as to its commencement date and with no assurance that anything will be done at any definite time.

Believing that the statutory authority was exceeded in this case, I would affirm the district court.