SPRINGFIELD, INC., Plaintiff,

v.

Bradley A. BUCKLES, Director Bureau of Alcohol Tobacco and Firearms, U.S. Department of the Treasury, Defendant.[1]

No. 99CV1224 JLG.

United States District Court, District of Columbia.

Sept. 14, 2000.

Stephen P. Halbrook, Richard E. Gardiner, Fairfax, VA, for Plaintiff.

1. Plaintiff originally named John P. Magaw, Director of the Bureau of Alcohol, Tobacco and Firearms, as Defendant. Bradley A. Buckles has since become the Director.

Martha E Rubio, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Defendant.

## *MEMORANDUM*

JUNE L. GREEN, District Judge.

Before the Court are Plaintiff and Defendant's cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons that follow, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

## I. *BACKGROUND*

The material facts in this case are not disputed. Plaintiff is a federally licensed importer of firearms. (Pl's. Facts at 2; Def's. Facts at 1.) Plaintiff was licensed from approximately 1989 to 1997 by the Bureau of Alcohol Tobacco and Firearms ("ATF") to import semiautomatic rifle models SAR–8 Sporter, SAR–4800 and others that were based on the FN–FAL and HK91 military assault rifle designs. (Pl's. Facts at 2; Administrative Record ("AR"), TAB 58 at 112–13.)[2] These firearms were imported under 18 U.S.C. § 925(d)(3), which requires the Secretary to authorize the importation of a firearm if it is "generally recognized as particularly suitable for or readily adaptable to sporting purposes" (hereinafter the "sporting purposes standard"). (Pl's. Facts at 2.)

In November of 1997, the President of the United States and the Secretary of the Treasury ordered a 120–day review of the importation of certain modified versions of semiautomatic rifles and ordered all pending importation applications suspended until the review was completed. (AR, TAB 41 at 232–34.) Following the President's order, Defendant notified Plaintiff by letter in November of 1997 that ATF was suspending seven of Plaintiff's import permits and suspending action on several pending import applications until the review was completed. (AR, TABs 1 and 2.)

The review was conducted by a group composed of representatives from the Department of the Treasury and ATF (hereinafter the "working group"). (AR, TAB 58 at 72.) The review focused on modified versions of semiautomatic rifles that had previously been determined non-importable in a 1989 decision by the ATF. (AR, TAB 58 at 71–2.) In that review, the ATF denied applications for a series of semiautomatic rifles that incorporated a number of military features. (AR, TAB 58 at 71.) The ATF identified eight such features as part of the military configuration: ability to accept detachable magazines, folding/telescoping stocks, separate pistol grips, bayonets, flash suppressors, bipods, grenade launchers, and night sights. (AR, TAB 58 at 71–72.) ATF took the position then that any of these features, other than the detachable magazines, would make a semiautomatic rifle not importable.[3] *Id.* Subsequent to this decision, many of the manufacturers modified the weapons to remove the disqualifying military features. *Id.*

The 1998 review sought to determine whether these modified rifles met the statutory requirements of the sporting purposes standard of 925(d)(3). (AR, TAB 58 at 72.) All the firearms in the 1998 review were semiautomatic variants of AK47, FN–FAL, HK91 and 93, Uzi and Sig SG550 military assault rifles. (*Id.*) To determine whether the rifles under review were of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes," the working group surveyed approximately 2,000 persons or groups, including hunting guides,

---

**2.** Citations to the record will hereinafter be referenced by the tab and page number ("AR, TAB __ at __".)

**3.** In discussing large capacity military magazines, the 1989 report explains that "large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity." (AR, TAB 58 at 92, citing 1989 report at 6.)

editors of hunting and shooting magazines, organized competitive groups, state game commissions, and law enforcement agencies and organizations. (AR TAB 58, at 89–90.) They also sought the views of industry members, trade associations, various other groups, and collected importation data, tracing data, and numerous advertisements and publications. (*Id.* at 90.) The working group also considered the legislative history of the Gun Control Act of 1968[4] and the history and interpretation of section 925(d)(3)'s sporting purposes standard. (*Id.* at 71–71.) Finally, the working group considered data regarding the use of these firearms by criminals. (*Id.* at 73.)

On April 6, 1998, the Department of the Treasury announced the review was complete. (AR, TAB 58 at 69.) The review reaffirmed the 1989 finding by ATF that semiautomatic rifles with the military features are not importable under the sporting purposes standard of 18 U.S.C. § 925(d)(3). (AR, TAB 58 at 71–72.) The review, however, took the additional step of extending the list of disqualifying military features to include detachable large capacity military magazines ("LCMM"). (AR, TAB 58 at 72.) Treasury Department conclusions were set forth in the *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles (April 1998)* (hereinafter "the Study"). (AR, TAB 58.)

ATF notified Plaintiff by letter on April 8, 1998, that the modified semiautomatic rifles it proposed to import did not meet the sporting purposes standard of 18 U.S.C. § 925(d)(3). (AR, TAB 7 at 32–33.) The letter specified that the basis for this decision was the Study, and enclosed a copy for Plaintiff's review. (*Id.*) The letter advised Plaintiff that no final action would be taken on its import applications until it had the opportunity to respond and present additional information and argument within thirty days of the date of the letter. (AR, TAB 7 at 33.) Plaintiff appealed, and

timely submitted written comments disputing the Study. (Def's. Facts at 3.)

ATF issued a final decision on January 20, 1999. (AR, TAB 11.) Rejecting Plaintiff's appeal, and relying on the findings of the Study, Defendant revoked Plaintiff's import permits for the SAR–8 Sporter and the SAR–4800 rifles, finding that they did not meet the requirements of 18 U.S.C. § 925(d)(3).

On November 17, 1999, Plaintiff filed a complaint in this Court seeking to compel Defendant to authorize the importation of these rifles, claiming that Defendant had misapplied the sporting purposes standard of 18 U.S.C. § 925(d)(3).

## II. *ANALYSIS*

The sole issue of law in this case is whether Defendant's interpretation of the sporting purposes standard of 18 U.S.C. § 925(d)(3) violates the Administrative Procedures Act ("APA") (Pl's. Mem. at 4; Def's. Mem. at. 23.) The APA, Section 706(2)(A), provides that a reviewing Court shall "hold unlawful and set aside agency action, findings and conclusions found to be … arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."

█ In determining whether the agency's interpretation violated the "arbitrary and capricious" test of Section 706(2)(A), the Court is guided by the two-step analysis of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the first step of *Chevron,* the reviewing court "must first exhaust the 'traditional tools of statutory construction' to determine whether Congress has spoken to the precise point at issue." *Natural Resources Defense Council Inc. v. Browner,* 57 F.3d 1122, 1125 (D.C.Cir.1995) (quoting *Chevron* at 843 n. 9, 104 S.Ct. 2778.) Further, the Court must "be guided to a degree by common sense as to the

4. Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 197

(codified as amended at 18 U.S.C. §§ 921–28 (1982)).

manner in which Congress is likely to delegate a policy decision . . . to an administrative agency." *F.D.A. v. Brown & Williamson Tobacco Corp.,* — U.S. —, —, 120 S.Ct. 1291, 1301, 146 L.Ed.2d 121 (2000). If this search yields a clear result, then Congress has expressed its intention as to the question, and deference is not appropriate. *See Hammontree v. NLRB,* 894 F.2d 438, 441 (D.C.Cir.1990).

Turning to a consideration of the first step, the Gun Control Act of 1968 generally prohibits the Secretary of the Treasury from authorizing the importation of firearms into the United States. 18 U.S.C. § 922(1). The Act does, however, create four narrow categories of firearms that the Secretary is required to authorize for importation. Of these four, only 18 U.S.C. § 925(d)(3) is relevant to the present inquiry.[5]

Although the Act requires the Secretary to authorize the importation of firearms that meet the sporting purposes standard, the Act does not define what a "sporting purpose" is, or how to determine whether it is "generally recognized as particularly suitable for or readily adaptable to sporting purposes." The text standing alone, therefore, does not provide a clear answer to whether LCMM rifles meet these criteria. The sporting purposes standard is facially ambiguous and requires interpretation by the Secretary as Congress chose not to provide an exhaustive definition.

This is supported by the legislative history, which indicates that the Secretary was "given fairly broad discretion in defining and administering the import prohibition." S.Rep. No. 90–1501, at 38 (1968).[6] The legislative history, therefore, indicates that Congress entrusted interpretation of the sporting purpose standard to the Secretary. With respect to the first step of *Chevron,* this Court finds nothing in the text, legislative history, purpose, or structure of the statute provides an unambiguous answer to whether LCMM rifles would qualify under the sporting purposes standard. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

Under the second step of *Chevron,* a reviewing court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute. *Id.* at 842–44, 104 S.Ct. 2778. Deference is to be given to an agency's interpretation of a statute as, "it is the agencies, not the courts, that have the technical expertise and political authority to carry out statutory mandates." *General Elec. Co. v. EPA,* 53 F.3d 1324, 1327 (D.C.Cir. 1995). Recent cases, however, make clear that an interpretation contained in a study or letter, as here, is not entitled to the usual level of deference accorded under *Chevron. See Christensen v. Harris County,* — U.S. —, — — —, 120 S.Ct. 1655, 1662–63, 146 L.Ed.2d 621 (2000); *see also, Independent Ins. Agents*

---

5. That section requires the Secretary to authorize a firearm be imported if the firearm:
   (3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the internal revenue code of 1954 and is **generally recognized as particularly suitable for or readily adaptable to sporting purposes,** excluding surplus firearms, except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.
   18 U.S.C. § 925(d)(3) (Emphasis added).

6. This discretion was restricted somewhat in 1986 when Congress passed the Firearm

Owners Protection Act, Pub.L. No. 99–308, which amended Section 925(d)(3) to provide that the Secretary "shall" (replacing "may") authorize the importation of a firearm that meets the sporting purposes standard. Although this change restricted the Secretary's discretion, it did not clarify the meaning, or alter the language of the sporting purposes standard itself. Although this change restricted the Secretary's discretion, the Senate Report to the 1986 law stated "[i]t is anticipated that in the vast majority of cases [the substitution of 'shall' for 'may' in the authorization section] will not result in any change in current practice." *Gilbert Equipment Co.,* 709 F.Supp. at 1083.

of America, Inc. v. John D. Hawke, Jr., 211 F.3d 638, 643(D.C.Cir.2000); *In Re Sealed Case,* 223 F.3d 775, 2000 WL 831827, *1, *5 (D.C.Cir.2000). Rather, under *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), interpretations contained in opinion letters are only entitled to "respect," which is less than full deference. *See Christensen,* —— U.S. at —— ——, 120 S.Ct. at 1662–63. The "respect," should be limited to the extent that an interpretation has the "power to persuade." *Id.* Under *Skidmore,* then, the Court must decide whether the rationale given for the agency's decision was persuasive.

Initially, the Court again notes that the text and legislative history of the Gun Control Act indicates that the Secretary was given discretion to determine what firearms would meet the sporting purposes criteria. Against this backdrop of legislative deference to the Secretary's interpretation of the statute, Plaintiff makes several broad claims. Plaintiff alleges that Defendant applied the wrong legal standards in conducting the Study, particularly in its interpretation of the "readily adaptable prong" of 18 U.S.C. § 925(d)(3), as well as in its interpretation of what competitions meet the "sporting purposes" prong. (Pl's Mem. at 2.) Further, Plaintiff alleges that Defendant's decision relied on the wrong standards, misapplied the law to the facts and was arbitrary, capricious and an abuse of discretion. (*Id.*) The Court, however, finds that Defendant's interpretation was reasonable, persuasive, and consistent with its statutory purpose.

■■■ Plaintiff claims that the "readily adaptable" prong of the sporting purposes standard is an independent criterion from the "particularly suitable" prong. Plaintiff claims that because the statute reads "particularly suitable for or readily adaptable to" (emphasis added), each must be given separate and distinctive weight. This Court recognizes that "[c]annons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless context dictates otherwise[.]" *Reit-*

er v. Sonotone Corporation, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (citation omitted). Here, however, the Secretary has historically considered "particularly suitable for or readily adaptable" as one standard. (AR, TAB 58 at 91.)

Under Plaintiff's interpretation, any nonsporting firearm that could be "readily adapted" would be required to be imported, but there would be no way for ATF to ensure that these weapons would be adapted once imported. Plaintiff's argument that LCMM rifles are readily adaptable because "the ability to accept a large capacity magazine is also the ability to accept a small capacity non-military magazine," (Pl's Mem. at 8) does not help its cause. As the Director of the ATF noted in his January 20, 1999 letter to Plaintiff:

> The magazine well of the subject rifles is constructed to accept [large capacity military magazines]. While a small capacity non-military magazine may be modified or designed so that it fits in these rifles, the rifles still have the ability to accept one of the designated magazines. In other words, even if the subject rifles have the ability to accept a small capacity non-military magazine, that does not change the fact that as configured, they have the ability to accept the designated magazines.

(AR, TAB 11 at 44.)

This Court finds the Secretary's decision to consider "particularly suitable for or readily adaptable to" as one standard to be reasonable considering the impact dividing the standard would have on the effectiveness of the purpose of the Gun Control Act. It is further settled that "[s]tatutes should be interpreted to avoid untenable distinctions and unreasonable results wherever possible." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982). To read "readily adaptable" as a separate requirement would be to reject the way that ATF states it has historically interpreted "particularly suitable for or readily adaptable to" and would also severely undermine the

effectiveness of the Act. Therefore, this Court finds that the Agency's interpretation of this provision is reasonable and consistent with the purpose of the statute.

■ Turning now to the sporting purposes standard itself, the Gun Control Act does not specify how it should be implemented, although legislative history indicates that "sporting purposes" refers to target shooting and hunting. *See, e.g.,* S.Rep. No. 90-1097, at 80 (1968); S.Rep. No. 90-1501, at 24, (1968). To aid in determining what firearms met the sporting purposes criteria, Congress recommended that the Secretary establish an advisory council. S.Rep. No. 1501, 90th Cong.2d Sess. 38 (1968).

Pursuant to this recommendation, following the enactment of the Gun Control Act in 1968, the Secretary created the Firearms Evaluation Panel, an advisory group composed of representatives of the military, law enforcement and the firearms communities, whose purpose was to establish guidelines for implementing the sporting purposes standard. *See Gilbert Equipment Company v. Higgins,* 709 F.Supp. 1071, 1082 (S.D.Ala.1989). Congress' recommendation of a council and the Secretary's subsequent creation of one indicates the high level of discretion that Congress afforded the Secretary to determine what firearms meet the sporting purposes standard.

The creation of the working group indicates that the Secretary considered the sporting purposes standard with particularity. The 1998 review demonstrates that the working group conducted a thorough examination of what activities meet the sporting purposes standard. The working group extensively surveyed individuals and groups interested in firearm use and ownership. The results of these surveys demonstrated that, with some exceptions, LCMM rifles were of limited use in either hunting or shooting competitions. As a result, the Study concluded there was "no

evidence that the ability to accept a large capacity military magazine serves any hunting purpose." (AR, TAB 58 at 96–98.)

Plaintiff does not argue that the rifles are widely used in hunting, but instead argues that the Secretary's definition of the sporting purposes standard is too narrow. (Pl. Mem. at 5.) Similarly, the working group construed target shooting narrowly by excluding such activities as "plinking" and "practical shooting"[7] competitions because "[t]here is nothing in the [legislative] history to indicate that [the sporting purposes standard] was intended to recognize every conceivable type of activity or competition that might employ a firearm." (AR, TAB 58 at 86.)

In making its conclusions that LCMM rifles no longer met the sporting purposes criteria, the working group relied on a number of changes since 1989. For instance, the passage of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–122, made it unlawful, *inter alia,* to manufacture, transfer, or possess (with certain exceptions) semiautomatic assault rifles or to possess and transfer large capacity military magazines. (AR, TAB 58, at 82 and 93–95.) The group perceived that Congress was concerned with the use of semiautomatic weapons and LCMMs for criminal activity. *Id.* at 83. Further, the working group's consideration of increasing criminal use of LCMM rifles is in keeping with congressional intent of the Act, which was to ensure that weapons be kept out of the hands of criminals, but that sporting rifles be accessible to legitimate sportsmen. *See Gun South Inc. v. Brady,* 877 F.2d 858, 866 (11th Cir.1989).

This Court finds that ATF's interpretation was reasonable and consistent with the statutory purpose and legislative history of the Gun Control Act. A broader definition of the term "sporting purposes," that accepts virtually any activity in which

---

7. "Practical shooting is an organized competitive activity in which participants are involved in 'moving, identifying, and engaging multiple targets and delivering a number of shots rapidly.'" (AR, TAB 58, at 87.)

a firearm is used as "sporting" would undermine the effect and purpose of the statute. In so ruling, the Court rejects Plaintiff's characterization that the ATF substituted its judgment for that which is "generally recognized." As the Court in *Gun South* stated, "[t]he term 'generally recognized' in section 925(d)(3) suggests a community standard which may change over time even though the firearm remains the same. Thus a changing pattern of use may significantly affect whether a firearm is *generally recognized* as *particularly suitable* for or *readily adaptable to* a sporting purpose." 877 F.2d at 866.

In the present case, it was determined that the standard had changed over time as was evidenced by the surveys conducted by the working group. (AR, TAB 58 at 73.) Furthermore, even federal firearms law has changed with the enactment of the Violent Crime Control Act and its attendant prohibition of large capacity military magazines. *Id.* at 83. This Court finds that the Study's consideration of the relevant community and Congressional intent was reasonable in determining what is "generally recognized." Similarly, the finding that LCMM rifles no longer met that criteria was also reasonable.

Finally, this Court rejects Plaintiff's claims that no deference should be given to an agency interpretation thirty years after enactment of the law and that this interpretation abrogates thirty years of administrative interpretation. (Pl's Mem. at 37.) It is well established that an agency's rules do not last forever and it must be given the opportunity to adapt to changing circumstances. *See American Trucking Ass'ns v. Atchison, T & S.F.R. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967); *Permian Basin Area Rate Cases,* 390 U.S. 747, 784, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). The only requirement is that the agency "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Telecommunications Research and Action Center v. FEC,* 26 F.3d 185, 193 (D.C.Cir.1994) (quoting *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970)). Here, the exhaustive review completed by the working group explains the prior policies, surveys and examines the present state of the sporting purposes standard, and articulates why a change in policy is being made. (AR, TAB 58 at 72.) Accordingly, the Court finds that the Secretary's decision is persuasive under the *Skidmore* standard.

## III. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is denied and Defendant's motion for Summary Judgment is granted. An appropriate order accompanies this Memorandum.

### ORDER

Upon consideration of Plaintiff's and Defendant's cross-motions for summary judgment, the oppositions and replies thereto, and for the reasons set forth in the accompanying Memorandum of Law, it is by the Court this 13th day of September 2000,

**ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED**; it is further

**ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** and this action is summarily **DISMISSED WITH PREJUDICE**; it is further

**ORDERED** that the Clerk of the Court shall enter a final judgment for defendant; and it is further

### FINAL JUDGMENT

In accordance with the Memorandum and Order of the Court, Honorable June L. Green, filed this day denying plaintiff's motion for summary judgment and granting defendant's motion for for summary judgment.

**IT IS HEREBY ORDERED AND ADJUDGED,**

That Final Judgment is hereby entered in favor of the defendant Bradley A. Buckles.